FILED
CLERK, U.S. DISTRICT COURT

MAY 21 2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____RS_____ DEPUTY

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
Facsimile: 214.520.1181

W. Scott Simmer (*pro hac vice* pending)
ssimmer@baronbudd.com
Noah M. Rich (*pro hac vice* pending)
nrich@baronbudd.com
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Telephone: 202.333.7352
Facsimile: 202.337.1039

William H. von Oehsen (*pro hac vice* pending)
William.vonOehsen@PowersLaw.com
Ronald S. Connelly (*pro hac vice pending*)
Ron.Connelly@PowersLaw.com
Megan La Suer (*pro hac vice* pending)
Megan.Lasuer@powerslaw.com
**POWERS PYLES SUTTER & VERVILLE PC**
1501 M Street NW, 7th Floor
Washington, DC 20005
Telephone: 202.872.6765
Facsimile: 202.785.1756

*Attorneys for Relator*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNDER SEAL,<br><br>PLAINTIFF,<br><br>v.<br><br>UNDER SEAL,<br><br>DEFENDANTS. | **CASE NO.: 2:21-CV-04249-DSF-SKx**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT & STATE-LAW COUNTERPARTS**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)**<br><br>**JURY TRIAL DEMANDED** |

1

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
Facsimile: 214.520.1181

W. Scott Simmer (*pro hac vice* pending)
ssimmer@baronbudd.com
Noah M. Rich (*pro hac vice* pending)
nrich@baronbudd.com
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Telephone: 202.333.7352
Facsimile: 202.337.1039

William H. von Oehsen (*pro hac vice* pending)
William.vonOehsen@PowersLaw.com
Ronald S. Connelly (*pro hac vice pending*)
Ron.Connelly@PowersLaw.com
Megan La Suer (*pro hac vice* pending)
Megan.Lasuer@powerslaw.com|
**POWERS PYLES SUTTER & VERVILLE PC**
1501 M Street NW, 7th Floor
Washington, DC 20005
Telephone: 202.872.6765
Facsimile: 202.785.1756

*Attorneys for Relator*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* ADVENTIST HEALTH SYSTEM/WEST and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, WASHINGTON, the COMMONWEALTHS of MASSACHUSETTS, PUERTO RICO, and VIRGINIA, and the DISTRICT OF COLUMBIA, | **CASE NO.:**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT & STATE-LAW COUNTERPARTS**<br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(B)(2)**<br><br>**JURY TRIAL DEMANDED** |

2

Plaintiffs/Relator,

v.

ABBVIE INC.; ALLERGAN SALES, LLC; ALLERGAN USA, INC.; ALCON LABORATORIES, INC.; ALCON PHARMACEUTICALS LTD; ALCON RESEARCH, LTD.; ASTRAZENECA LP; ASTRA-ZENECA PHARMACEUTICALS LP; ELI LILLY & CO.; GLAXOSMITH-KLINE, PLC; GLAXOSMITHKLINE, LLC; NOVARTIS PHARMA-CEUTICALS CORPORATION; NOVARTIS AG; SANDOZ, INC.; SANOFI-AVENTIS U.S. LLC; SANOFI US SERVICES INC.; SANOFI S.A.; and GENZYME CORPORATION,

Defendants.

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT AND STATE-LAW COUNTERPARTS

3

## TABLE OF CONTENTS

I.     INTRODUCTION ...........................................................................................9

II.    JURISDICTION & VENUE ........................................................................10

III.   PERFECTION OF FILING & STANDING .................................................11

IV.    PARTIES .....................................................................................................11

       A.   Plaintiff-Relator ...............................................................................11

       B.   Defendants ........................................................................................13

            1.   AbbVie ....................................................................................13

            2.   Alcon .......................................................................................14

            3.   AstraZeneca ............................................................................14

            4.   Eli Lilly ...................................................................................15

            5.   GSK .........................................................................................16

            6.   Novartis ...................................................................................17

            7.   Sanofi ......................................................................................18

V.     FEDERAL & STATE FALSE CLAIMS ACTS ..........................................19

VI.    STATUTORY & REGULATORY BACKGROUND ..................................22

       A.   The 340B Program ............................................................................22

            1.   340B Covered Entities ............................................................24

            2.   Manufacturer Agreements .......................................................27

            3.   Calculation of the 340B Ceiling Price ....................................28

            4.   Application of the 340B Ceiling Price .....................................32

       B.   Historic Abuse of the 340B Program by Drug Manufacturers ...........39

       C.   Medicaid Program Reimbursement at AAC .......................................42

VII.   THE FRAUDULENT SCHEME ..................................................................44

       A.   Scope of Liability .............................................................................44

            1.   Medicaid FFS ..........................................................................45

  a. Retail Medicaid FFS Subject to AAC Since April 2017 ...................................................................45

  b. Medicaid FFS Subject to AAC by State Law.................45

 2. Government-Funded 340B Covered Entities............................46

  a. Federally Funded 340B Covered Entities.......................46

  b. State or Locally Funded 340B Covered Entities............47

 3. Critical Access Hospitals Billing to Medicare..........................47

B. Defendants Have Failed to Charge Accurate Ceiling Prices ..............47

 1. Unlawfully Inflated Ceiling Prices Prior to 2019 .....................49

 2. Unlawfully Inflated Ceiling Prices After January 1, 2019 .......51

  a. Unlawfully Inflated Ceiling Prices through Q1 2019 ....51

  b. Unlawfully Inflated Ceiling Prices through Q2 2019 ....52

  c. Unlawfully Inflated Ceiling Prices through Q3 2019 ....53

C. Defendants Intentionally Disregarded the 340B Statutory Formula...54

 1. AbbVie................................................................................54

  a. Depakote ER....................................................................55

  b. Fetzima ............................................................................56

  c. Lexapro ............................................................................58

  d. Linzess .............................................................................59

  e. Zenpep DR.......................................................................61

 2. Alcon.................................................................................61

 3. AstraZeneca .......................................................................63

  a. Byetta..............................................................................64

  b. Bydureon.........................................................................66

  c. Crestor.............................................................................67

  d. Farxiga ............................................................................69

  e. Kombiglyze XR...............................................................70

f.    Nexium ........................................................72

g.    Onglyza.......................................................73

h.    Pulmicort Flexhaler .....................................75

i.    Symbicort.....................................................76

j.    Tudorza Pressair .........................................77

4.    Eli Lilly ............................................................78

a.    Forteo ........................................................78

b.    Humulin R ..................................................79

5.    GSK...................................................................80

a.    Lamictal XR/Lamictal ODT..........................81

6.    Novartis...........................................................85

a.    Diovan........................................................86

b.    Focalin XR..................................................87

c.    Gleevec ......................................................89

d.    Omnitrope ..................................................90

e.    Trileptal.....................................................91

7.    Sanofi ..............................................................92

a.    Apidra .......................................................93

b.    Lantus ........................................................94

c.    Renagel ......................................................96

d.    Renvela ......................................................97

D.    Defendants Concealed the Truth and Acted Knowingly and Intentionally............................................................99

VIII.  DEFENDANTS CONSPIRED TO VIOLATE THE FCA .........................100

A.    Defendants Coordinated Their Illegal Conduct through Trade Organizations..................................................101

B.    Defendants Coordinated to Conceal Accurate 340B Ceiling Prices.103

IX.    CAUSES OF ACTION.................................................................................105

COUNT I (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)) ...............105

COUNT II (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))..............106

COUNT III (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))............106

COUNT IV (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)) ...........107

COUNT V (Violation of California False Claims Act).......................................107

COUNT VI (Violation of Colorado Medicaid False Claims Act)........................108

COUNT VII (Violation of Connecticut False Claims Act for Medical Assistance
    Programs)..................................................................................................110

COUNT VIII (Violation of Delaware False Claims and Reporting Act)..............111

COUNT IX (Violation of District of Columbia False Claims Act) .....................112

COUNT X (Violation of Florida False Claims Act) ...........................................114

COUNT XI (Violation of Georgia False Medicaid Claims Act).........................115

COUNT XII (Violation of Hawaii False Claims Act).........................................116

COUNT XIII (Violation of Illinois False Claims Act)........................................117

COUNT XIV (Violation of Indiana False Claims and Whistleblower Protection
    Act) .........................................................................................................119

COUNT XV (Violation of Iowa False Claims Act) ............................................120

COUNT XVI (Violation of Louisiana Medical Assistance
    Programs Integrity Law)............................................................................121

COUNT XVII (Violation of Maryland False Health Claims Act) .......................123

COUNT XVIII (Violation of Massachusetts False Claims Act)..........................124

COUNT XIX (Violation of Michigan Medicaid False Claims Act) ....................125

COUNT XX (Violation of Minnesota False Claims Act) ...................................127

COUNT XXI (Violation of Montana False Claims Act).....................................128

COUNT XXII (Violation of Nevada False Claims Act) .....................................130

COUNT XXIII (Violation of New Jersey False Claims Act) ..............................131

COUNT XXIV (Violation of New Mexico Fraud Against Taxpayers Act) .........132

COUNT XXV (Violation of New York False Claims Act) ..................................134

COUNT XXVI (Violation of North Carolina False Claims Act)..........................135

COUNT XXVII (Violation of Oklahoma Medicaid False Claims Act)................136

COUNT XXVIII (Violation of Rhode Island False Claims Act)..........................137

COUNT XXIX (Violation of Tennessee Medicaid False Claims Act)................139

COUNT XXX (Violation of Texas Medical Assistance Program, Damages, and
        Penalties Act).........................................................................................140

COUNT XXXI (Violation of Vermont False Claims Act)..................................142

COUNT XXXII (Violation of Virginia Fraud Against Taxpayers Act) ...............143

COUNT XXXIII (Violation of Washington Medicaid False Claims Act)............145

COUNT XXXIV (Violation of False Claims to Government of Puerto Rico
        Programs, Contracts, and Services Act) ......................................................146

X.     PRAYER FOR RELIEF ..........................................................................147

## I.    **INTRODUCTION**

1.    Adopted by Congress in 1990, the Medicaid Drug Rebate Program ("MDRP") covers a significant portion of drug purchases in the United States. To gain payment under Medicaid for covered drugs, a manufacturer must enter a standardized agreement with the Department of Health and Human Services. These manufacturers agree to provide rebates to states on their Medicaid drug purchases. In exchange for the rebates, state Medicaid programs generally must cover all of a participating manufacturer's drugs when prescribed for a medically accepted indication.

2.    Section 340B of the Public Health Service Act, enacted in 1992, expanded elements of this price protection beyond the Medicaid program. Under Section 340B, referred to as the "340B Program," manufacturers participating in Medicaid must offer discounted drugs to a group of statutorily-defined hospitals and clinics called "Covered Entities." All of these Covered Entities are nonprofits that serve as the nation's healthcare "safety net," providing essential services and significant amounts of uncompensated care to underserved and vulnerable populations, regardless of ability to pay. The 340B Program is a vital and indispensable tool to offset the costs of uncompensated or under-compensated care.

3.    The 340B statute establishes a clear, straightforward statutory formula to determine the maximum allowable price of a drug, referred to as the "Ceiling Price." In addition to applying up-front, across-the-board discounts on all covered outpatient drugs, this formula penalizes manufacturers for increasing the prices of drugs faster than inflation—referred to as the "inflationary penalty." The inflationary penalty can be substantial; if a manufacturer increases the price of a drug much faster than inflation, the discounts required by the 340B statute can nearly equal the cost of the drug.

4.    To determine the Ceiling Prices by which a manufacturer must abide in

dealing with a 340B Covered Entity, one must apply the statutory formula to confidential pricing data. The only entities that possess all of the data necessary to determine the ceiling prices are the manufacturers themselves.

5. Manufacturers have taken advantage of this opacity and information asymmetry to defraud 340B Covered Entities—and the federal and state governments—into paying higher drug prices than the law allows.

6. Defendants have increased the prices for many of their drugs far in excess of the rate of inflation for many years. For these drugs, the required discount now often amounts to nearly the entire cost of the drug. Rather than discounting the cost of their drugs based on these extraordinary increases in prices, as they are required to do, Defendants have overcharged on drug sales to 340B Covered Entities, and to Medicare and Medicaid Programs using 340B pricing, well in excess of 340B Ceiling Prices.

7. Relator brings this action to recover hundreds of millions of dollars in overpayments that Defendants have illegally overcharged 340B Covered Entities, and Medicare and Medicaid Programs using 340B pricing, for their drugs.

## II.   JURISDICTION & VENUE

8. This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a), 28 U.S.C. § 1331, and 28 U.S.C. § 1345. The Court has original jurisdiction over the state law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under state laws for the recovery of funds paid as the result of false claims and arises from the same transaction or occurrence brought on behalf of the United States under 31 U.S.C. § 3730 and 28 U.S.C. § 1367.

9. This Court has personal jurisdiction over Defendants because, among other things, they transact business in this District and engaged in wrongdoing in this District.

10. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C.

10

§ 1391(b) and (c). Defendants transact business within this District and acts proscribed by 31 U.S.C. § 3729 occurred in this District.

11. The causes of action alleged herein are timely brought because, among other things, of efforts by Defendants to conceal from the United States and the Whistleblower States their wrongdoing in connection with the allegations made herein.

## III. PERFECTION OF FILING & STANDING

12. This Complaint was properly filed in camera and under seal, as required by the False Claims Act and the State *Qui Tam* statutes.

13. Prior to the filing of the original Complaint, Plaintiff properly served a copy of the Complaint and a written disclosure of substantially all material evidence and information upon the United States and the *Qui Tam* States.

14. There has been no "public disclosure," as that term is used in the FCA or the State *Qui Tam* statutes, of the allegations forming the core elements of the Counts against Defendants.

15. In the event there is found to be any such public disclosure, Plaintiff-Relator is an "original source," as that term is used in the FCA and the State *Qui Tam* statutes, of the allegations or transactions forming the core elements of the cause(s) of action against Defendants.

16. In particular, consistent with the meaning of "original source" under the FCA and the State *Qui Tam* statutes, Plaintiff-Relator has direct and independent knowledge of the information on which the allegations are based, and voluntarily provided the information to the United States and the States before filing this action.

## IV. PARTIES

### A. Plaintiff-Relator

17. Plaintiff-Relator Adventist Health System/West ("Relator" or "Adventist Health") has its principal place of business in Roseville, California.

11

Adventist Health operates throughout California, as well as in portions of Hawaii, Oregon, and Washington. It is a California nonprofit religious corporation operating a healthcare system comprising 23 hospitals, with more than 3,500 beds. Adventist Health has some 37,000 associates, including employees, medical staff physicians, and allied health professionals and volunteers. Adventist Health operates numerous clinics and outpatient facilities, 14 home care agencies, and 4 joint-venture retirement centers.

18. Since its beginning more than a century ago as a ministry of the Seventh-day Adventist Church, Adventist Health has taken a progressive approach to providing health care. Its commitment to serving its communities dates back to 1866, when the first Seventh-day Adventist health care facility opened in Battle Creek, Michigan. Their dedicated pioneers promoted the "radical" concepts of proper nutrition, exercise, and sanitation in a facility devoted not just to the healing arts, but also to the prevention of disease.

19. By the early twentieth century, Seventh-day Adventists on the West Coast had established a number of sanitariums and hospitals. Their early vision to treat the whole person—mind, body, and spirit—continues to provide the foundation for Adventist Health's mission. Today, the healthcare system sponsored by the Seventh-day Adventist Church circles the globe. Its West Coast system is part of an international network with more than 220 hospitals, as well as numerous clinics and nursing homes worldwide.

20. Adventist Health has direct knowledge of the conduct alleged in this Complaint, and, with the assistance of 340B experts and pharmaco-economists, conducted an independent investigation to uncover false claims submitted to the United States and the Whistleblower States. Accordingly, Relator is an "original source" of the non-public information alleged in this Complaint within the meaning of the federal FCA and the State FCAs.

**B.   Defendants**

**1.   AbbVie**

21.   Defendant Allergan Sales, LLC is a Delaware corporation with its principal place of business at 5 Giralda Farms, Madison, NJ 07940.

22.   Defendant Allergan, Inc. is a Delaware corporation with its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054.

23.   Defendant AbbVie, Inc. is a Delaware corporation with its principal place of business at 1 North Waukegan Road, North Chicago, IL 60064. AbbVie is the corporate successor to Allergan Sales, LLC, Allergan, Inc., and Forest Laboratories, having completed its purchase of Allergan on May 8, 2020. All of the aforementioned companies are collectively referred to herein as "AbbVie."

24.   The drugs manufactured and sold by AbbVie and paid for by 340B Covered Entities, as well as federal and state programs for which it failed to charge correct Ceiling Prices, include: ACULAR LS 0.4% OPHTH SOL, DEPAKOTE ER 250 MG TABLET, DEPAKOTE ER 250 MG TABLET, FETZIMA 20-40 MG TITRATION PACK, FETZIMA ER 120 MG CAPSULE, FETZIMA ER 20 MG CAPSULE, FETZIMA ER 40 MG CAPSULE, FETZIMA ER 80 MG CAPSULE, LATISSE 0.03% EYELASH SOLUTION, LATISSE 0.03% EYELASH SOLUTION, LEXAPRO 10 MG TABLET, LEXAPRO 20 MG TABLET, LEXAPRO 5 MG TABLET, LINZESS 145 MCG CAPSULE, LINZESS 290 MCG CAPSULE, NAMENDA 10 MG TABLET, NAMENDA 10 MG TABLET, NAMENDA 5-10 MG TITRATION PACK, NAMENDA XR 14 MG CAPSULE, NAMENDA XR 14 MG CAPSULE, NAMENDA XR 21 MG CAPSULE, NAMENDA XR 28 MG CAPSULE, NAMENDA XR 28 MG CAPSULE, NAMENDA XR 7 MG CAPSULE, NAMENDA XR TITRATION PACK, NAMZARIC 14 MG-10 MG CAPSULE, NAMZARIC 21 MG-10 MG CAPSULE,

13

NAMZARIC 28 MG-10 MG CAPSULE, NAMZARIC 7 MG-10 MG CAPSULE, NAMZARIC TITRATION PACK, POLYTRIM EYE DROPS, SAVELLA 100 MG TABLET, SAVELLA 25 MG TABLET, SAVELLA 50 MG TABLET, SAVELLA TITRATION PACK, TRICOR 145 MG TABLET, TRILIPIX DR 135 MG CAPSULE, and ZENPEP DR 15,000 UNIT CAPSULE.

### 2.    Alcon

25.    Defendant Alcon Pharmaceuticals Ltd. is a Swiss corporation with its principal place of business at Rue Louis d'Affry 6, 1701 Fribourg, Switzerland.

26.    Defendant Alcon Laboratories, Inc. is a corporation organized and existing under and by virtue of the laws of the State of Delaware, and having its principal place of business at 6201 South Freeway, Fort Worth, Texas 76134.

27.    Defendant Alcon Research, Ltd. is a Delaware with its principal place of business at 6201 South Freeway, Fort Worth, TX 76134.

28.    Alcon Pharmaceuticals Ltd., Alcon Laboratories, Inc., and Alcon Research, Ltd. are collectively referred to herein as "Alcon."

29.    The drugs manufactured and sold by Alcon and paid for by 340B Covered Entities and federal and state programs for which it failed to charge correct Ceiling Prices include: AZOPT 1% EYE DROPS, AZOPT 1% EYE DROPS, BETOPTIC S 0.25% EYE DROPS, BETOPTIC S 0.25% EYE DROPS, CILOXAN 0.3% EYE DROPS, CIPRO HC OTIC SUSPENSION, DUREZOL 0.05% EYE DROPS, MAXIDEX 0.1% EYE DROPS, MAXITROL EYE DROPS, MOXEZA 0.5% EYE DROPS, TOBRADEX EYE DROPS, TOBRADEX EYE DROPS, TOBREX 0.3% EYE DROP, TRAVATAN Z 0.004% EYE DROP, and VIGAMOX 0.5% EYE DROPS.

### 3.    AstraZeneca

30.    Defendant AstraZeneca Pharmaceuticals LP is a limited partnership organized and existing under and by virtue of the laws of the State of Delaware, and

14

having its headquarters located at 1800 Concord Pike, Wilmington, Delaware 19850.

31. Defendant AstraZeneca LP is a limited partnership organized and existing under and by virtue of the laws of the State of Delaware, and having its principal place of business at 1800 Concord Pike, Wilmington, Delaware, 19850.

32. AstraZeneca Pharmaceuticals LP and AstraZeneca LP are collectively referred to herein as "AstraZeneca."

33. The drugs manufactured and sold by AstraZeneca and paid for by 340B Covered Entities and federal and state programs for which it failed to charge correct Ceiling Prices include: BYETTA 10 MCG DOSE PEN INJ, BYETTA 5 MCG DOSE PEN INJ, CRESTOR 10 MG TABLET, CRESTOR 20 MG TABLET, CRESTOR 40 MG TABLET, CRESTOR 5 MG TABLET, FARXIGA 10 MG TABLET, FARXIGA 5 MG TABLET, KOMBIGLYZE XR 2.5-1,000 MG TAB, KOMBIGLYZE XR 5-1,000 MG TAB, KOMBIGLYZE XR 5-500 MG TABLET, NEXIUM DR 10 MG PACKET, NEXIUM DR 20 MG CAPSULE, NEXIUM DR 20 MG CAPSULE, NEXIUM DR 20 MG PACKET, NEXIUM DR 40 MG CAPSULE, NEXIUM DR 40 MG CAPSULE, NEXIUM DR 40 MG PACKET, ONGLYZA 2.5 MG TABLET, ONGLYZA 2.5 MG TABLET, ONGLYZA 5 MG TABLET, ONGLYZA 5 MG TABLET, PULMICORT 180 MCG FLEXHALER, PULMICORT 90 MCG FLEXHALER, SYMBICORT 160-4.5 MCG INHALER, SYMBICORT 160-4.5 MCG INHALER, SYMBICORT 80-4.5 MCG INHALER, SYMLINPEN 120 PEN INJECTOR, SYMLINPEN 60 PEN INJECTOR, XIGDUO XR 10 MG-1,000 MG TAB, XIGDUO XR 10 MG-500 MG TABLET, XIGDUO XR 5 MG-1,000 MG TABLET, and XIGDUO XR 5 MG-500 MG TABLET.

### 4. Eli Lilly

34. Defendant Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with its corporate offices and principal place of business at Lilly Corporate Center, Indianapolis, IN 46285.

35. The drugs manufactured and sold by Eli Lilly and paid for by 340B Covered Entities and federal and state programs for which it failed to charge correct Ceiling Prices include: CIALIS 10 MG TABLET, CIALIS 2.5 MG TABLET, CIALIS 20 MG TABLET, FORTEO 600 MCG/2.4 ML PEN INJ, HUMULIN R 500 UNIT/ML KWIKPEN, and STRATTERA 100 MG CAPSULE.

**5.     GSK**

36. Defendant GlaxoSmithKline, PLC is a United Kingdom public limited company with its principal place of business at Brentford, 8 Middlesex, England.

37. Defendant GlaxoSmithKline, LLC is a Delaware limited liability company with its principal places of business at 5 Crescent Drive, Philadelphia, PA 19112 and 5 Moore Drive, Research Triangle, NC 27709. Defendant GlaxoSmithKline, LLC is a wholly owned subsidiary of Defendant GlaxoSmithKline, PLC.

38. GlaxoSmithKline, PC and GlaxoSmithKline, LLC are collectively referred to herein as "GSK."

39. The drugs manufactured and sold by GSK and paid for by 340B Covered Entities and federal and state programs for which it failed to charge correct Ceiling Prices include: LAMICTAL ODT 100 MG TABLET, LAMICTAL ODT 200 MG TABLET, LAMICTAL ODT 25 MG TABLET, LAMICTAL ODT 50 MG TABLET, LAMICTAL ODT START KIT (BLUE), LAMICTAL ODT START KIT (GREEN), LAMICTAL ODT START KT (ORANGE), LAMICTAL XR 100 MG TABLET, LAMICTAL XR 200 MG TABLET, LAMICTAL XR 25 MG TABLET, LAMICTAL XR 250 MG TABLET, LAMICTAL XR 300 MG TABLET, LAMICTAL XR 50 MG TABLET, LAMICTAL XR START KIT (BLUE), LAMICTAL XR START KIT (GREEN), LAMICTAL XR START KIT (ORANGE), and REQUIP XL 12 MG TABLET.

16

### 6. Novartis

40. Defendant Novartis Pharmaceuticals Corporation is a Delaware corporation with its principal place of business in East Hanover, New Jersey. Defendant Novartis Pharmaceuticals Corporation is a subsidiary of Defendant Novartis AG.

41. Defendant Novartis AG is a Swiss corporation with its principal place of business at Lichtstrasse 35, CH-4002 Basel, Switzerland.

42. Defendant Sandoz Inc. is a corporation organized and existing under and by virtue of the laws of the State of New Jersey, and having its principal place of business at 506 Carnegie Drive, Suite 400, Princeton, New Jersey 08540. Sandoz is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland.

43. Defendants Novartis Pharmaceuticals Corporation, Novartis AG, and Sandoz Inc. are collectively referred to herein as "Novartis."

44. The drugs manufactured and sold by Novartis and paid for by 340B Covered Entities and federal and state programs for which it failed to charge correct Ceiling Prices include: DIOVAN 320 MG TABLET, DIOVAN 40 MG TABLET, DIOVAN 80 MG TABLET, DIOVAN HCT 160-25 MG TABLET, DIOVAN HCT 80-12.5 MG TABLET, EXELON 13.3 MG/24HR PATCH, EXELON 4.6 MG/24HR PATCH, EXELON 9.5 MG/24HR PATCH, EXFORGE 10-160 MG TABLET, FOCALIN XR 10 MG CAPSULE, FOCALIN XR 15 MG CAPSULE, FOCALIN XR 25 MG CAPSULE, FOCALIN XR 30 MG CAPSULE, FOCALIN XR 35 MG CAPSULE, FOCALIN XR 40 MG CAPSULE, FOCALIN XR 5 MG CAPSULE, GLEEVEC 100 MG TABLET, GLEEVEC 400 MG TABLET, LESCOL XL 80 MG TABLET, LESCOL XL 80 MG TABLET, LOTREL 5-10 MG CAPSULE, LOTREL 5-20 MG CAPSULE, OMNITROPE 5 MG/1.5 ML CRTG, OMNITROPE 10 MG/1.5 ML CRTG, RITALIN LA 10 MG CAPSULE, and

RITALIN LA 20 MG CAPSULE.

### 7. Sanofi

45. Defendant Sanofi-Aventis U.S. LLC is a Delaware corporation with its principal place of business at 55 Corporate Drive, Bridgewater, NJ 08807.

46. Defendant Sanofi US Services Inc. is a Delaware corporation with its principal place of business at 55 Corporate Drive, Bridgewater, NJ 08807.

47. Defendant Genzyme Corporation is a Massachusetts corporation with its principal place of business at 500 Kendall Street, Cambridge, MA 02142.

48. Defendant Sanofi S.A., also known as Sanofi Consumer Healthcare, is a French multinational pharmaceutical company with its principal place of business in Paris, France. Defendant Sanofi S.A. was formed as Sanofi-Aventis in 2004 by the merger of Aventis and Sanofi-Synthélabo, which were each the product of several previous mergers.

49. At all relevant times, Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Genzyme Corporation have been wholly owned subsidiaries of Defendant Sanofi S.A., with the profits of each inuring to Defendant Sanofi S.A.'s benefit. All of these entities are collectively referred to herein as "Sanofi."

50. The drugs manufactured and sold by Sanofi and paid for by 340B Covered Entities and federal and state programs for which it failed to charge correct Ceiling Prices include: AMARYL 1 MG TABLET, AMARYL 2 MG TABLET, AMBIEN 10 MG TABLET, AMBIEN 5 MG TABLET, AMBIEN CR 12.5 MG TABLET, AMBIEN CR 6.25 MG TABLET, APIDRA 100 UNITS/ML VIAL, APIDRA SOLOSTAR 100 UNITS/ML, ARAVA 10 MG TABLET, ARAVA 20 MG TABLET, AVALIDE 150-12.5 MG TABLET, AVALIDE 300-12.5 MG TABLET, AVAPRO 150 MG TABLET, AVAPRO 300 MG TABLET, AVAPRO 75 MG TABLET, DOXERCALCIFEROL 2.5 MCG CAP, LANTUS 100 UNIT/ML VIAL, LANTUS SOLOSTAR 100 UNIT/ML, RENAGEL 800 MG TABLET,

18

RENVELA 0.8 GM POWDER PACKET, RENVELA 2.4 GM POWDER PACKET, RENVELA 800 MG TABLET, ZOLPIDEM TART ER 12.5 MG TAB, and ZOLPIDEM TART ER 6.25 MG TAB.

## V.    FEDERAL & STATE FALSE CLAIMS ACTS

51.    The federal False Claims Act ("FCA") makes it unlawful for any person to defraud the Government and cause it to pay money it otherwise would not pay.

52.    The FCA imposes liability on "any person who," among other things:

    a.  "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A),

    b.  "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B),

    c.  "conspires to commit a violation of" the FCA's substantive provisions, *id.* § 3729(a)(1)(C),

    d.  "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property," *id.* § 3729(a)(1)(D), or

    e.  "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government," *id.* § 3729(a)(1)(G).

53.    Any person who violates the FCA "is liable to the United States for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 . . . , plus 3 times the amount of damages which the Government sustains because of the act of that

19

person." *Id.* § 3729(a)(1). Adjusted for inflation, these penalties currently range from eleven thousand six hundred sixty-five dollars ($11,665) to twenty-three thousand three hundred thirty-one dollars ($23,331) per false claim. 28 C.F.R. § 85.5.

54. The FCA provides that "the terms 'knowing' and 'knowingly' (A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1).

55. The FCA provides that "the term 'claim' (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—(i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—(I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." *Id.* § 3729(b)(2).

56. The FCA provides that "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." *Id.* § 3729(b)(3). For Medicare and Medicaid funds, "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment . . . is an obligation . . . for purposes of [the FCA]." 42 U.S.C. § 1320a-7k(d)(3). An overpayment must be reported and returned "[b]y the later of . . . 60 days after the

date on which the overpayment was identified . . . or the date any corresponding cost report is due, if applicable." *Id.* § 1320a-7k(d)(2).

57.   The FCA provides that "the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

58.   Additionally, many jurisdictions have passed False Claims Act laws, which generally closely track the FCA.  These statutes include the California False Claims Act, Cal. Gov't Code §§ 12650 *et seq.*; the Colorado Medicaid False Claims Act, Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; the Connecticut False Claims Act, Conn. Gen. Stat. tit. 4 Ch. 55e §§ 4-274 *et seq.*; the Delaware False Claims and Reporting Act, Del. Code tit. 6, §§ 1201 *et seq.*; the District of Columbia False Claims Act, D.C. Code §§ 2-308.13 *et seq.*; the Florida False Claims Act, Fla. Stat. tit. 6, §§ 68.081 *et seq.*; the Georgia False Medicaid Claims Act, Ga. Code §§ 49-4-168 *et seq.*; the Hawaii False Claims Act, Haw. Rev. Stat. §§ 661-21 *et seq.*; the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; the Indiana Medicaid False Claims and Whistleblower Protection Act, Ind. Code §§ 5-11-5.7 *et seq.*; the Iowa False Claims Act, Iowa Code §§ 685.1 *et seq.*; the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. §§ 46:437.1 *et seq.*; the Maryland False Health Claims Act, Md. Code, Health-Gen. §§ 2-601 *et seq.*; the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §§ 400.601 *et seq.*; the Minnesota False Claims Act, Minn. Stat. §§ 15C.01 *et seq.*; the Montana False Claims Act, Mont. Code §§ 17-8-401 *et seq.*; the Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; the New Jersey False Claims Act, N.J. Stat. §§ 2A:32C-1 *et seq.*; the New Mexico Fraud Against Taxpayers Act, N.M. Stat. §§ 44-9-1 *et seq.*; the New York False Claims Act, N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; the North Carolina False Claims Act, N.C. Gen. Stat. §§ 1-605 *et seq.*; the Oklahoma Medicaid False Claims Act,

Okla. Stat. tit. 63, §§ 5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.001 *et seq.*; the Texas Medical Assistance Program, Damages, and Penalties Act, Tex. Hum. Res. Code. §§ 32.039 *et seq.*; the Vermont False Claims Act, Vt. Stat. tit. 32 §§ 631 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code §§ 8.01-216.1 *et seq.*; the Washington State Medicaid False Claims Act, Wash. Rev. Code. §§ 74.66.005 *et seq.*; and the False Claims to Government of Puerto Rico Programs, Contracts, and Services Act, P.R. Laws tit. 32, §§ 2934 *et seq.* The aforementioned jurisdictions are referred to collectively herein as the "Whistleblower States" and the aforementioned statutes are referred to collectively herein as the "State *Qui Tam* Statutes" or "State FCAs." The State FCAs proscribe the same conduct described above, *see supra* ¶¶ 7.

59. The State FCAs apply, *inter alia*, to the state portion of Medicaid losses caused by false claims to the jointly federal-state funded Medicaid program and failure to report and return any overpayments therefrom. The State FCAs also apply to Covered Entities that are state-owned and/or funded in whole or in part by the state.

## VI.    STATUTORY & REGULATORY BACKGROUND

### A.    The 340B Program

60. The MDRP requires a drug manufacturer to enter into, and have in effect, a national rebate agreement with the Secretary of the Department of Health and Human Services ("HHS") in exchange for state Medicaid coverage of most of the manufacturer's drugs. The Secretary has delegated authority to administer the Medicaid program, including the MDRP, to the Centers for Medicare and Medicaid Services ("CMS"). Under the MDRP, manufacturers agree to pay a rebate "of each dosage form and strength and package size of each covered outpatient drug

dispensed . . . for which payment was made," 42 U.S.C. § 1396r-8(b)(1), (2), which includes an adjustment to disincentivize manufacturers to increase the prices of their drugs faster than inflation. In exchange for the rebates, state Medicaid programs generally must cover all of a participating manufacturer's drugs when prescribed for a medically accepted indication.

61. The MDRP provides discounts to state Medicaid agencies for outpatient prescription drugs. It does not extend these discounts to other entities, including federally funded clinics and public hospitals, which, in the wake of the enactment of the MDRP, were experiencing substantial increases in their outpatient drug costs. H.R. Rep. No. 102-384(II), at 11 (1992).

62. In 1992, Congress sought to expand the scope of these discounted prices. Congress implemented these changes by enacting Section 340B of the Public Health Service Act: a set of provisions intended to lower drug costs for certain public and not-for-profit hospitals, community health centers, and other government-funded clinics that serve large numbers of low-income communities. Veterans Health Care Act of 1992, Pub. L. 102-585, § 602, 106 Stat. 4943, 4967 (Nov. 4, 1992) (codified at 42 U.S.C. § 256b). These provisions are known collectively as the 340B Drug Pricing Program, or, simply, the 340B Program. The facilities that are eligible for the program are known as "Covered Entities" in the statute's parlance.

63. The 340B Program is designed to provide 340B Covered Entities with substantial discounts off the drug prices generally available through the market. Congress intended for the 340B Program "to enable these entities to stretch scarce Federal resources as far as possible, reaching more eligible patients and providing more comprehensive services." H.R. Rep. No. 102-384(II), at 10 (1992). The 340B statute provides a clear, straightforward formula for calculating the maximum price a manufacturer may charge a Covered Entity for a covered outpatient drug, called

23

the "Ceiling Price."

64. Manufacturers are not required to participate in the MDRP or the 340B Program. However, if they wish to have their drugs covered and reimbursed by Medicaid and the Medicare Part B outpatient insurance program, they must also participate in the 340B Program. (Medicare is generally divided into Part A, which covers inpatient service, and Part B, which covers outpatient services.)

65. The Secretary of HHS has delegated authority to administer the 340B statute to the Health Resources & Services Administration ("HRSA"), which administers the 340B Program through its Office of Pharmacy Affairs ("OPA").

### 1.    340B Covered Entities

66. Since the 340B statute was implemented, Covered Entities have used the savings generated to provide critical safety-net healthcare services for their communities, including low-income and underserved populations within those communities—for example, by providing free or discounted drugs and other health and case management services, increasing service locations, developing patient education programs, and providing translation and transportation services to improve patients' access to high-quality care.

67. When the 340B statute was enacted in 1992, the group of Covered Entities permitted to participate in the 340B Program included federally funded health centers and clinics providing services such as family planning, AIDS intervention, and hemophilia treatment, as well as public and certain not-for-profit hospitals serving a large proportion of low-income populations. Pub. L. No. 102-585, § 340B(a)(4)(A)-(L), 106 Stat. at 4967-68.

68. Recognizing the value of the 340B Program, Congress expanded the categories of eligible Covered Entities. In 2010, as a part of the Patient Protection and Affordable Care Act, in addition to making other changes to the Program to improve drug companies' compliance and to protect Covered Entities from

24

overcharges, Congress expanded the definition of Covered Entities to include certain critical access hospitals, children's hospitals, free-standing cancer hospitals, and sole community hospitals. Pub. L. No. 111-148, § 7101(a), 124 Stat 119, 821-22 (Mar. 23, 2010).

69. Currently, six types of hospitals and ten types of clinics that receive certain federal grants are eligible to participate in the 340B Program. A Covered Entity (like Relator Adventist Health) may have multiple sites participating in the program as long as each site is an integral part of the Covered Entity, is registered with HRSA, and follows the program's rules.

70. Participating Covered Entities purchase 340B-eligible drugs at or below the 340B Ceiling Price, but charge payers based on the reimbursement agreements that the Covered Entities have with these payers. By design, therefore, the 340B statute provides Covered Entities with two related benefits:

- First, in cases in which the Covered Entities' patients are uninsured or under-insured, the 340B statute enables the Covered Entity to stretch its already scarce resources because it has spent fewer resources on drug purchases.

- Second, in cases in which the Covered Entities' patients have insurance that reimburses the Covered Entity above the actual acquisition cost ("AAC") for the 340B-eligible drug, the Covered Entity receives a financial benefit that the nonprofit safety-net provider will reinvest in providing needed services to vulnerable populations.

71. As discussed in more detail below, *see infra* ¶¶ 117-124, since April 2017, when a 340B Covered Entity seeks reimbursement for retail drugs dispensed to a Medicaid fee-for-service ("FFS") patient, the Covered Entity must charge Medicaid at AAC. 42 C.F.R. § 447.518(a)(2). In other words, the Covered Entity charges Medicaid for the actual price of the drug, which is the 340B Ceiling Price.

25

These payment rules effectively make Medicaid a partner with the 340B Covered Entity because Medicaid pays the 340B Ceiling Price for 340B-eligible retail FFS drugs. Thus, when a manufacturer overcharges 340B Covered Entities for retail drugs provided to Medicaid FFS patients, the manufacturer has also overcharged Medicaid because Medicaid pays for the inflated acquisition cost of the drugs. These requirements were imposed by statute in many states prior to the publication of CMS's rule in 2017.

72. Multiple sites of Relator Adventist Health are Covered Entities, including:

- Adventist Health Clear Lake, 15630 18th Ave., Clearlake, CA 95422;
- Adventist Health Tehachapi Valley, 1100 Magellan Dr., Tehachapi, CA 93561;
- Adventist Health Medocino Coast, 700 River Dr., Fort Bragg, CA 95437;
- Adventist Health Castle, 640 Ulukahiki St., Kailua, HI 96734;
- Adventist Health Glendale, 1509 Wilson Terr., Glendale, CA 91206;
- Adventist Health Hanford, 115 Mall Dr., Hanford, CA 93230;
- Adventist Health Selma, 1141 Rose Ave., Selma, CA 93662;
- Adventist Health Lodi Memorial, 975 S. Fairmont Ave., Lodi, CA 95240;
- Adventist Health Tillamook, 1000 3rd St., Tillamook, OR 97141;
- Adventist Health Portland, 10123 SE Market St., Portland, OR 97216;
- Adventist Health Reedley, 372 West Cypress Ave., Reedley, CA 93654;
- Adventist Health and Rideout, 726 4th St., Marysville, CA 95901;
- Adventist Health Bakersfield, 2615 Chester Ave., Bakersfield, CA 93301;
- Adventist Health Sonora, 1000 Greenley Rd., Sonora, CA 95370;
- Adventist Health St. Helena, 10 Woodland Rd., St. Helena, CA 94574;
- Adventist Health Ukiah Valley, 275 Hospital Dr., Ukiah, CA 95482;
- Adventist Health White Memorial, 1720 East Cesar E. Chavez Ave., Los Angeles, CA 90033; and

- Adventist Health Howard Memorial, 1 Marcela Dr., Willits, CA 95490.

73.    The number of Covered Entities that take advantage of the 340B Program has grown from 8,605 in 2001 to 16,572 in 2011.  From 2005 to 2011, the number of hospitals participating nearly tripled, from 591 to 1,673, and the number of hospital sites (separate locations of a given hospital that all participate in 340B) almost quadrupled, from 1,233 to 4,426.  As of October 2017, 12,722 Covered Entities were participating in the program.

74.    Covered Entities have been able to save a great deal of money through the 340B Program.  Drug sales through the 340B Program account for a significant proportion of the U.S. drug market, with estimates ranging from 2% to 8%.  340B drug purchases total billions of dollars per year.

### 2.    Manufacturer Agreements

75.    Pharmaceutical manufacturers that participate in Medicaid are required to participate in the 340B Program.  42 U.S.C. § 1396r-8(a)(1).  Each pharmaceutical manufacturer participating in the 340B Program, including Defendants, must sign a Pharmaceutical Pricing Agreement ("PPA") with the HHS Secretary that limits the prices they may charge Covered Entities for 340B Program drugs.  *Id.* § 256b(a)(1).

76.    PPAs are effective for one year and are automatically renewed for successive one-year terms unless the pharmaceutical manufacturer gives written notice of its intent not to renew.

77.    Under their PPAs, Defendants have agreed, to provide covered outpatient drugs to 340B Covered Entities at or below the Ceiling Price, as explained below.

78.    Defendants were also required to, and did, sign a PPA Addendum under which they agreed to "furnish the [HHS] Secretary with reports, on a quarterly basis, that include the price of each covered outpatient drug that is subject to the Agreement, that according to the manufacturer, represents the maximum price that

Covered Entities may permissibly be required to pay for the drug" (*i.e.*, the manufacturers' calculation of the Ceiling Price), and to "offer each Covered Entity covered outpatient drugs for purchase at or below the applicable ceiling price, if such drug is made available to any other purchaser at any price." *See* HRSA, *General Instructions for Completing the 340B Drug Pricing Program Pharmaceutical Pricing Agreement – Addendum,* https://www.hrsa.gov/sites/default/files/opa/manufacturers/ppa_addendum.pdf (last visited April 30, 2021).

### 3.    Calculation of the 340B Ceiling Price

79.    The 340B Program applies to "covered outpatient drugs," which are defined as prescription drugs and biological products other than vaccines. 42 U.S.C. § 1396r-8(k)(2). Manufacturers are responsible for ensuring that the 340B discount is passed on to the Covered Entity, regardless of whether the Covered Entity purchases drugs from a wholesaler or directly from the manufacturer.

80.    To ensure that Covered Entities have access to drugs at a lower cost, the 340B statute requires manufacturers that choose to participate in the 340B Program to abide by Ceiling Prices—the maximum prices that drug companies can charge to Covered Entities for covered outpatient drugs.

81.    The 340B statute establishes a straightforward statutory formula for calculating the Ceiling Price, based on the drug rebate amount from the MDRP: a discount equal to the difference between the drug's average manufacturer price ("AMP") from the previous quarter and its unit rebate amount ("URA"). Put roughly algebraically:

**Ceiling Price = (AMP – URA) × drug package size.**

42 U.S.C. § 256b(a)(1). This is similar to the formula used in the MDRP. However, under the MDRP, entities initially purchase drugs at a higher price and manufacturers are later required to pay quarterly rebates. By contrast, rather than requiring manufacturers to pay rebates, the 340B statute uses the URA to establish

28

an up-front reduction in price for each covered outpatient drug. *Id.*

82.    The AMP is the average price paid to the manufacturer for the drug in the United States by wholesalers (for drugs distributed to retail community pharmacies) and retail community pharmacies (that purchase drugs directly from the manufacturer). 42 U.S.C. § 1396r-8(k)(1)(A).

83.    The URA is split into two parts: the basic rebate and the additional rebate. The basic rebate is calculated by using the greater of the following two formulas: subtracting the manufacturer's "best price" from the AMP; or AMP multiplied by a specified percentage, which has been 23.1 percent for most drugs since January 1, 2010. *Id.* § 1396r-8(c)(1)(A). The "best price" represents the best price available from the manufacturer to any wholesaler, retailer, provider, HMO, nonprofit entity, or government entity, excluding prices charged to certain federal programs, 340B Covered Entities, Medicare Part D plans, and certain other purchasers. *Id.* § 1396r-8(c)(1)(C).

84.    The additional rebate is the difference between the drug's current AMP and its initial AMP, adjusted for inflation. *See id.* § 1396r-8(c)(2).

85.    Specifically, the additional rebate is the amount that the drug's AMP for a particular quarter exceeded the "base date AMP," which is a covered outpatient drug's AMP for the third quarter of 1990 if the drug was FDA-approved on or before October 1, 1990, or the AMP for the first full quarter of sales if the drug was FDA-approved after that date, either of which is adjusted by an inflation factor. 42 U.S.C. § 1396r-8(c)(2). The rate of inflation is measured by the consumer price index for all urban consumers ("CPI-U") since the drug's market date. This additional rebate, called the "inflationary penalty," is added to the URA. The inflationary penalty was originally limited to single-source (brand-name) drugs, but Congress extended the penalty to generic drugs under the Bipartisan Budget Act of 2015. Pub. L. 114-74, § 602(a)(2), 129 Stat. 584, 596-97 (Nov. 2, 2015).

86.    The total inflation rate from 2010 to 2020 was 18.3%, or an annual inflation rate of 1.7%.  The following table shows the CPI-U for the last decade:

**CONSUMER PRICE INDEX FOR ALL URBAN CONSUMERS (CPI-U)**
**(not seasonally adjusted)**

| ALL ITEMS (1982-84=100) | U.S. City Average | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
| **Consumer Price Index** | | | | | | | | | | | | |
| 2011 | 220.223 | 221.309 | 223.467 | 224.906 | 225.964 | 225.722 | 225.922 | 226.545 | 226.889 | 226.421 | 226.230 | 225.672 |
| 2012 | 226.665 | 227.663 | 229.392 | 230.085 | 229.815 | 229.478 | 229.104 | 230.379 | 231.407 | 231.317 | 230.221 | 229.601 |
| 2013 | 230.280 | 232.166 | 232.773 | 232.531 | 232.945 | 233.504 | 233.596 | 233.877 | 234.149 | 233.546 | 233.069 | 233.049 |
| 2014 | 233.916 | 234.781 | 236.293 | 237.072 | 237.900 | 238.343 | 238.250 | 237.852 | 238.031 | 237.433 | 236.151 | 234.812 |
| 2015 | 233.707 | 234.722 | 236.119 | 236.599 | 237.805 | 238.638 | 238.654 | 238.316 | 237.945 | 237.838 | 237.336 | 236.525 |
| 2016 | 236.916 | 237.111 | 238.132 | 239.261 | 240.229 | 241.018 | 240.628 | 240.849 | 241.428 | 241.729 | 241.353 | 241.432 |
| 2017 | 242.839 | 243.603 | 243.801 | 244.524 | 244.733 | 244.955 | 244.786 | 245.519 | 246.819 | 246.663 | 246.669 | 246.524 |
| 2018 | 247.867 | 248.991 | 249.554 | 250.546 | 251.588 | 251.989 | 252.006 | 252.146 | 252.439 | 252.885 | 252.038 | 251.233 |
| 2019 | 251.712 | 252.776 | 254.202 | 255.548 | 256.092 | 256.143 | 256.571 | 256.558 | 256.759 | 257.346 | 257.208 | 256.974 |
| 2020 | 257.971 | 258.678 | 258.115 | 256.389 | 256.394 | 257.797 | 259.101 | 259.918 | 260.280 | 260.388 | 260.229 | 260.474 |
| 2021 | 261.582 | 263.014 | | | | | | | | | | |
| **Percent change from 12 months ago** | | | | | | | | | | | | |
| 2011 | 1.6 | 2.1 | 2.7 | 3.2 | 3.6 | 3.6 | 3.6 | 3.8 | 3.9 | 3.5 | 3.4 | 3.0 |
| 2012 | 2.9 | 2.9 | 2.7 | 2.3 | 1.7 | 1.7 | 1.4 | 1.7 | 2.0 | 2.2 | 1.8 | 1.7 |
| 2013 | 1.6 | 2.0 | 1.5 | 1.1 | 1.4 | 1.8 | 2.0 | 1.5 | 1.2 | 1.0 | 1.2 | 1.5 |
| 2014 | 1.6 | 1.1 | 1.5 | 2.0 | 2.1 | 2.1 | 2.0 | 1.7 | 1.7 | 1.7 | 1.3 | 0.8 |
| 2015 | -0.1 | 0.0 | -0.1 | -0.2 | 0.0 | 0.1 | 0.2 | 0.2 | 0.0 | 0.2 | 0.5 | 0.7 |
| 2016 | 1.4 | 1.0 | 0.9 | 1.1 | 1.0 | 1.0 | 0.8 | 1.1 | 1.5 | 1.6 | 1.7 | 2.1 |
| 2017 | 2.5 | 2.7 | 2.4 | 2.2 | 1.9 | 1.6 | 1.7 | 1.9 | 2.2 | 2.0 | 2.2 | 2.1 |
| 2018 | 2.1 | 2.2 | 2.4 | 2.5 | 2.8 | 2.9 | 2.9 | 2.7 | 2.3 | 2.5 | 2.2 | 1.9 |
| 2019 | 1.6 | 1.5 | 1.9 | 2.0 | 1.8 | 1.6 | 1.8 | 1.7 | 1.7 | 1.8 | 2.1 | 2.3 |
| 2020 | 2.5 | 2.3 | 1.5 | 0.3 | 0.1 | 0.6 | 1.0 | 1.3 | 1.4 | 1.2 | 1.2 | 1.4 |
| 2021 | 1.4 | 1.7 | | | | | | | | | | |

U.S. Bureau of Labor Statistics, *Consumer Price Index Historical Tables for U.S. City Average*,  https://www.bls.gov/regions/mid-atlantic/data/consumerpriceindex historical_us_table.htm (last visited Apr. 29, 2021).

87.    Prices for many prescription drug prices have significantly outpaced inflation.  AARP's Rx Price Watch Report provides pricing trend data for prescriptions widely used by Americans.  The September 2018 report found that the "annual percent change in retail prices for brand name prescription drugs has consistently increased substantially faster than general inflation" at a rate of "8.4% compared with 2.1%."  Stephen W. Schondelmeyer & Leigh Purvis, *AARP Rx Price Watch Report - Trends in Retail Prices of Brand Name Prescription Drugs Widely Used by Older Americans: 2017 Year-End Update* 5 (Sept. 2018), www.aarp.org/content/dam/aarp/ppi/2018/09/trends-in-retail-prices-of-brand-name-prescription-drugs-year-end-update.pdf.  The following chart from AARP's 2018 report demonstrates this stark difference:



88.     Pursuant to their PPAs, Defendants send their respective AMP data to CMS as part of their quarterly reporting obligation under the MDRP.  CMS then calculates the URA and sends the AMP and URA data to HRSA, which calculates the 340B Ceiling Price.  HRSA calculates the price of the total number of doses in the package (package size), and then the price of a case of multiple packages (case package size), which results in the 340B Ceiling Price and the corresponding quantity at which Covered Entities actually purchase the covered outpatient drug.

89.     The AMP, URA, and Ceiling Price data are made confidential by statute.  42 U.S.C. § 1396r-8(b)(3)(D).  As a result, pharmaceutical manufacturers such as Defendants do not rely on HRSA's Ceiling Prices, but rather calculate their own Ceiling Prices.  Before April 1, 2019, Covered Entities were not privy to the Ceiling Prices reported by manufacturers to HRSA.  On April 1, 2019, HRSA began providing Covered Entities with 340B Ceiling Prices as reported by manufacturers. However, Covered Entities do not have access to manufacturer-reported Ceiling Prices prior to the first quarter of 2019, and neither HRSA nor Covered Entities have access to the manufacturers' proprietary pricing data to allow them to determine whether these Ceiling Prices are accurate.

90.     In other words, HRSA maintains its own list of 340B Ceiling Prices, but does not have knowledge of the pharmaceutical manufacturers' calculations of Ceiling Prices, or the prices at which drugs are actually sold to Covered Entities.

91.     This confidentiality thus leaves the wholesalers and the Covered Entities in the dark, with no way to validate whether they are being charged correctly by pharmaceutical manufacturers.  Only the pharmaceutical manufacturers have access to all of the relevant information, and only the pharmaceutical manufacturers know whether they are charging Covered Entities more than the 340B statutory Ceiling Price.

### 4.     Application of the 340B Ceiling Price

92.     Under the MDRP and the 340B statute, if a manufacturer increases the price of a covered outpatient drug much faster than the rate of inflation, the additional rebate or discount owed for that drug can be substantial.  Prior to 2010, the URA was unlimited, theoretically allowing for negative prices where rebates or discounts exceeded the price of a drug.  In 2010, Congress capped the URA at 100% of the AMP, preventing negative prices.  Pub. L. 111-148, § 2501(e), 124 Stat. at 309.

93.     However, beginning in 2024, this cap will be removed, requiring manufacturers whose drug prices vastly exceed the rate of inflation to pay the Medicaid program each time that drug is sold.  American Rescue Plan Act of 2021, Pub. L. 117-2, § 9816, 135 Stat. 4 (Mar. 11, 2021) (codified at 42 U.S.C. § 1396r-8(c)(2)(D)).

94.     The following graph depicts the impact of the inflationary penalty on a fictional drug introduced in 2008 whose price increases at a rate of fifteen percent annually, compared to the much lower annual rate of inflation.  The basic rebate is expressed as a fraction of the current AMP, but the additional rebate anchors the price to the AMP at launch, adjusted for inflation.  Therefore, as demonstrated

below, once the inflationary penalty begins to apply in 2009, it very quickly reduces the 340B Ceiling Price. By 2020, the AMP has increased from $100 per unit to more than $500 per unit, but the inflation-adjusted AMP is only $120.21 per unit, resulting in a large inflationary penalty where the URA equals the AMP:



95.    Numerous manufacturers participating in the MDRP and 340B Program have increased the prices of their drugs so quickly that the URA equals the AMP.

96.    In the example above, the basic rebate remains steady at 23.1% of AMP. However, the basic rebate is calculated as the lesser of: (1) 23.1% of AMP (for brand-name drugs), or (2) AMP minus best price. The best price takes into account all discounts offered in the commercial market, so if a manufacturer offers a commercial purchaser a discount of more than 23.1% off AMP, the basic rebate will increase. For example, all else being equal, if a manufacturer offers a commercial retailer a 40% discount, the best price will decrease and the basic rebate will be 40%. The following chart tracks the price of the same fictional drug, but with a 40% basic rebate beginning in 2014. In this case, the effect of the increased basic rebate causes the URA to equal the AMP four years earlier than in the above example, beginning in 2016:

33



97.    Although the 340B statute can require the 340B Ceiling Price to approach zero, it prevents the price from actually reaching zero.  The statute refers to a "purchase" and "the amount required to be paid" for a covered drug.  42 U.S.C. § 256b(a)(1).  Unlike the MDRP, therefore, these statutory provisions require a minimal, non-zero price to be paid.  Because the statute is designed to curb the rate of price hikes—and to impose the greatest price reductions on drugs whose prices rise the fastest—it requires a Ceiling Price of only $0.01 per unit (the non-zero price closest to a 100% discount) for drugs whose URA equals the AMP.

98.    HHS has consistently recognized that when URA equals AMP, these statutory terms require a price of a penny, and no more than a penny, which prevents Ceiling Prices of zero or below while otherwise fully effectuating the statutory Ceiling Price formula.  HRSA, *Clarification of Penny Pricing Policy, Policy Release No. 2011-2* at 1 (Nov. 21, 2011), *available at* https://www.hrsa.gov/ sites/default/files/opa/programrequirements/policyreleases/pennypricingclarificatio n112111.pdf.  For more than ten years, HHS has advised manufacturers that, "when the URA equals the AMP in the calculation of the 340B ceiling price . . . , the manufacturer should charge $0.01 per unit of measure for zero priced drugs." *Id.* Any other formula would "nullify the [inflationary] pricing penalty" and would

clearly be inconsistent with the 340B statute. *Id.*

99. The so-called "penny pricing policy" has been reiterated in numerous HHS publications and presentations. For instance, on July 18, 2006, HHS OIG employee Madeline Wallack (née Francescatti) gave a presentation at the 340B Coalition Conference entitled "OIG Update: Review of 340B Drug Prices." In attendance at the conference were employees of numerous drug manufacturers, including upper-level employees from each Defendant. Wallack included a summary of the 2006 OIG report and discussed the 340B statutory penny pricing formula.

100. The 340B statutory penny pricing formula was cemented in a Final Rule published in the Federal Register in 2017, with an effective date of January 1, 2019. *340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation*, 82 Fed. Reg. 1210 (Jan. 5, 2017); *340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation*, 83 Fed. Reg. 61563 (Nov. 30, 2018). The 340B statutory penny pricing formula adopted in the Final Rule implements the unambiguous language and intent of the 340B statute and is the same policy that HHS has consistently imposed, formally and informally, for more than a decade.

101. In the preamble to the final penny pricing rule, HHS explained that penny pricing is a result mandated by the unambiguous text of the statute, which can require Ceiling Prices near zero, but not at zero:

> Where the URA equals the AMP for a drug, the section 340B ceiling price formula would result in a ceiling price of zero. The statute, however, clearly contemplates a payment to a manufacturer and the act of purchasing covered outpatient drugs. Setting a zero dollar ceiling price would run counter to the statutory scheme and lead to unintended consequences, including operational challenges.

82 Fed. Reg. at 1214. HHS explained that "[s]etting the price at $0.01 requires a payment and therefore ensures that there is a purchase within the meaning of the

statute and, as a practical matter, between the buyer and the seller." *Id.* at 1216. HHS also explained that the statute does not permit prices above a penny per unit when the AMP minus URA equals zero, as such a result "would decrease the effect of the inflationary component of the statutory formula established by Congress." *Id.* at 1215. Because the unambiguous statutory formula would otherwise require a zero price, but such a result would not allow for a "purchase," the only reasonable interpretation of the statute is to use "the next positive price ($0.01) when the calculation of the 340B ceiling price is zero." *Id.*

102. Some manufacturers, keen to realize the benefits of participating in the 340B Program, but disgruntled with Congress's decision to impose price controls when manufacturers intentionally increase the prices of their drugs faster than the rate of inflation, have proposed alternative methodologies for calculating the Ceiling Price. Such alternative methodologies include using the prior quarter pricing, wholesale acquisition cost ("WAC"), or Federal Ceiling Price ("FCP"). These and any other formulas outside of the 340B statutory scheme are the product of wishful thinking and are ungrounded in the text of the statute, the legislative history, the canons of statutory construction, reason, and common sense. HHS has thoroughly rebutted each of these arguments and has demonstrated that they are all objectively unreasonable.

103. Drug manufacturers have sometimes argued that the penny pricing policy is inconsistent with the 340B statute because Congress did not intend to provide such large discounts. However, as HHS has explained, although the 340B statutory formula can result in very low prices for drugs, this result comports with the plain text of the statute. Any "alternatives to penny pricing would be inconsistent with the 340B ceiling price formula established in section 340B . . . and would raise 340B ceiling prices above the statutory formula in ways that would be inconsistent with the statutory scheme." 82 Fed. Reg. at 1215.

104. Manufacturers have further requested that HHS alter the statutory formula in their favor, appealing that it should use the drug pricing policy of the Veterans Administration ("VA"), which permits "good faith negotiation to set a reasonable price in the event of a negative or zero" price. *Id.* at 1216. However, while Congress empowered the VA to depart from its drug pricing formula, 38 U.S.C. § 8126(a)(2), "[t]here is no similar authority in the 340B statute to exceed the basic price calculation, and therefore HHS does not have the same ability to adjust the pricing formula set by statute." *Id.*

105. Manufacturers have further argued that the inflationary penalty results in an unconstitutional taking. However, manufacturers have no obligation to participate in the 340B Program, and the imposition of the inflationary penalty is attributable solely to the manufacturers' choices:

> Manufacturer participation in the 340B Program is also voluntary . . . . Moreover, it is important to note that a manufacturer controls when a product reaches a zero 340B ceiling price through its own pricing decisions. If a manufacturer does not wish to offer a zero 340B ceiling price, the manufacturer may choose not to participate in the 340B Program or may alter its drug pricing practices so as not to cause a zero 340B ceiling price.

*Id.* at 1216.

106. Manufacturers have also argued that the 340B statutory formula creates absurd results and may increase the potential for drug diversion. However, Congress already addressed this concern by directing HHS to "provide for improvements in compliance by covered entities . . . in order to prevent diversion." 42 U.S.C. § 256b(d)(2)(A). Congress also expressly authorized manufacturers to audit Covered Entities for compliance with the diversion prohibition. *Id.* § 256b(a)(5)(A)(C). In addition, as HHS has explained, "[t]he penny pricing policy has been in place for many years and HHS does not have evidence that the policy causes significant risks of stockpiling, diversion, harm to patients, and abuse of controlled substances." *Id.* Nothing in the language or legislative history of the 340B statute suggests that

Congress intended to abandon the Ceiling Price formula under any circumstances. Indeed, abandoning the 340B pricing formula when the URA equals the AMP would be the truly absurd result, as it would insulate the manufacturers that raised their drugs' prices the fastest from the consequences of the inflationary penalty.

107. Far from being contrary to the statute, an absurd result, or an unconstitutional taking, the discounts demanded by the 340B statutory formula are precisely what Congress intended, and are reasonable requirements for manufacturers choosing to participate in the 340B Program. If a manufacturer is dissatisfied the statutory scheme, it can stop engaging in extreme price increases or stop participating in the 340B Program.

108. Indeed, the manufacturers making these arguments are outliers whose views do not comport with of most industry participants. The vast majority of drug manufacturers participating in the 340B Program comply, and have always complied, with the statutory formula requiring penny prices when a drug's URA equals its AMP.

109. As such, the 340B statute unambiguously requires a penny price when the URA equals the AMP. Any alternative methodologies are entirely unsupported by the plain text of the 340B statute, which requires the application of a straightforward formula to determine the 340B Ceiling Price. These alternative methodologies would effectively read the inflationary penalty—a central component of the price discounts underlying the 340B statute—out of the statute, and they are the product of objectively unreasonable interpretations of the law. Most manufacturers have always complied with the 340B statutory penny pricing formula and have not adopted these unreasonable alternative interpretations that are divorced from the text of the statute. Moreover, HHS has consistently warned manufacturers away from any interpretation of the statute that would impose a non-340B statutory formula to calculate 340B Ceiling Prices. Therefore, even prior to 2019, the 340B

statute has always required manufacturers to provide drugs at one cent when the inflationary penalty would result in a zero price.

**B.      Historic Abuse of the 340B Program by Drug Manufacturers**

110.   Purchases in the 340B Program are now almost as large as the Medicaid program's outpatient drug sales.  However, the 340B Program lacks Medicaid's regulatory infrastructure and controls.  While Medicaid rebates directly and transparently lower drug costs for the government, the 340B Program discounts have been impenetrable, with only the drug makers themselves knowing whether their Ceiling Prices have been accurate.

111.   The following graphic, created by HHS's Office of Inspector General ("OIG"), demonstrates the complex interchange of information required to determine the 340B Ceiling Price, and the ripe opportunities for fraud presented to manufacturers who can manipulate that price by reporting false data to the government and by overcharging 340B Covered Entities, as well as Medicare and Medicaid Programs using 340B pricing:



HHS OIG, *Review of 340B Prices* 4 (2006), *available at* https://oig.hhs.gov/ oei/reports/oei-05-02-00073.pdf.  Beginning April 1, 2019—after the publication of this graphic—HRSA began providing Covered Entities with 340B Ceiling Prices as reported by manufacturers.  However, manufacturers' internal pricing data remains confidential, and neither HRSA nor Covered Entities are able to verify if the Ceiling Prices reported by manufacturers are accurate.

112.  Despite the 340B Program's recognized value, HRSA has faced significant challenges in ensuring that drug companies are providing the mandated discounts.  In a March 2003 report, OIG reviewed the sales of 11 prescription drugs sold by five drug companies and determined that all five companies had overcharged 340B providers for the 11 drugs by an estimated $6.1 million in one year alone.  HHS

OIG, *Pharmaceutical Manufacturers Overcharged 340B-Covered Entities* 3 (Mar. 10, 2003), *available at* https://www.hrsa.gov/sites/default/files/opa/program requirements/reports/manufacturersovercharge031003.pdf.

113.    Likewise, in a 2006 report, OIG found significant overpayments by Covered Entities: "In June 2005, 14 percent of total purchases made by [seventy] 340B entities exceeded the 340B Ceiling Prices, resulting in total overpayments of $3.9 million . . . .  Sixty-eight of the seventy sampled entities overpaid on at least one purchase."  HHS OIG, *Review of 340B Prices* at i (July 2006), *available at* https://oig.hhs.gov/oei/reports/oei-05-02-00073.pdf.  The "largest overpayments . . . were due to purchases for which the price did not reflect HRSA's 'penny price' policy," resulting in "overpayments rang[ing] from 1,790 to 450,000 percent over the 340B ceiling prices." *Id.* at 14.

114.    A 2011 Government Accountability Office report identified the central weakness of the 340B Program: it is susceptible to fraud because "it primarily relies on participants' self-policing to ensure compliance."  Gov't Accountability Office, *Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement* 21 (2011), *available at* https://www.gao.gov/assets/gao-11-836.pdf.  Covered Entities "reported that it is difficult to determine whether they have been charged correctly for drugs because manufacturers' calculations of 340B prices are not transparent." *Id.*  In the absence of internal manufacturer data, it is impossible to determine whether manufacturers have presented accurate pricing information to the government—and whether the Ceiling Prices based on that information are accurate.

115.    Beginning in 2019, numerous manufacturers provided notice to HRSA of their intention to reduce their 340B Ceiling Prices, but few have addressed pre-2019 overcharges.  In addition, even after January 1, 2019, many manufacturers have still failed to charge accurate Ceiling Prices as required by the 340B statute and the

agreements they entered into with HHS.

116. On December 14, 2020, Attorneys General from 28 states and the District of Columbia, led by then California Attorney General Xavier Becerra, called on HHS to impose civil penalties on a group of pharmaceutical manufacturers who have either stopped or plan to stop honoring discounts to contract pharmacies under the 340B Program. Letter from Xavier Becerra, Cal. Atty. Gen. *et al.* to Alex M. Azar, HHS Secretary, and Thomas J. Engels, HRSA Administrator (Dec. 14, 2010), *available at* https://portal.ct.gov/-/media/AG/Press_Releases/2019/340B-Multistate-Letter-12142020_FINAL1.pdf. In their letter, the Attorneys General explained the urgency of enforcing the strictures of the 340B Program:

> Each day that drug manufacturers violate their statutory obligations, vulnerable patients and their healthcare centers are deprived of the essential healthcare resources that Congress intended to provide. Drug manufacturers are, without justification, flouting discounted pricing requirements for low-income patients . . . , depriving such patients of affordable medications to the detriment of the health centers and hospitals that serve these vulnerable communities. During a national public health crisis, these actions are especially egregious and cannot be ignored.

*Id.* at 2.

### C.    Medicaid Program Reimbursement at AAC

117. Both 340B discounts and Medicaid rebates are calculated using the same formula. However, the formulas operate in different ways, and at different points in the drug purchase process. As previously discussed, 340B discounts are provided at the time a drug is purchased and take the form of a lower purchase price. In contrast, Medicaid rebates are made after a drug has been purchased and the state Medicaid office (or its designee) provides the manufacturer with proof that it has dispensed rebate-eligible drugs.

118. In an FFS system, state Medicaid programs contract with and pay health care providers, such as physicians, hospitals, and clinics, for services that they provide to Medicaid beneficiaries. When a 340B Covered Entity treats a Medicaid

FFS beneficiary, a dilemma arises. The 340B Covered Entity might treat the patient with drugs purchased at the Ceiling Price, and then bill Medicaid for the cost of the drugs. But if the state Medicaid agency then seeks a rebate from the manufacturer, the manufacturer will have provided two discounts on the same drug—one in the form of a deeply discounted 340B Ceiling Price to the Covered Entity and the other in the form of a post-purchase rebate to the state.

119. Federal law, therefore, prohibits using 340B pricing for drugs that are administered to Medicaid FFS patients and are subject to Medicaid rebates, unless the Covered Entity complies with certain requirements. 42 U.S.C. § 256b(a)(5)(A)(i). This provision is commonly known as the "duplicate discount prohibition" because it is intended to protect manufacturers from giving a 340B discount and Medicaid FFS rebate on the same drug.

120. Covered Entities may "carve in" drugs dispensed or administered to their Medicaid FFS patients when placing orders through the 340B Program— meaning Covered Entities may obtain 340B Ceiling Prices for such drugs—as long as they comply with various safeguards to ensure the state Medicaid agencies exclude those claims from their rebate requests. Carving in 340B drugs for a Covered Entity's Medicaid population is common but not typically required. Only California and Illinois require Covered Entities to use 340B prices for all Medicaid FFS claims.

121. For many years, there was no federal requirement relating to how much state Medicaid agencies must pay for 340B Program drugs. However, in February 2016, CMS published a regulation requiring state FFS programs, by April 1, 2017, to pay for such drugs based on their AAC when used on a retail basis. *Medicaid Program; Covered Outpatient Drugs*, 81 Fed. Reg. 5170, 5342, 5355 (Feb. 1, 2016). The AAC is defined as a state Medicaid agency's determination of the pharmacy providers' actual prices paid to acquire the drugs, plus a nominal dispensing fee. 42

C.F.R. § 447.502.

122. As a practical matter, this means that, for claims accruing on or after April 1, 2017, Medicaid reimbursement for retail 340B drugs prescribed to Medicaid FFS beneficiaries cannot exceed the 340B Ceiling Price plus a nominal dispensing fee.

123. Prior to April 1, 2017, several states had already implemented AAC reimbursement of FFS pharmacy claims, and most of those states applied their AAC payment policies to both retail and non-retail drugs.

124. Because Medicaid FFS reimbursement rates are capped at the 340B Ceiling Price, the amount Medicaid reimburses a 340B Covered Entity fluctuates with the Ceiling Price. When manufacturers report inflated Ceiling Prices to Covered Entities, the Covered Entities unwittingly pass along those inflated prices to Medicaid when submitting claims for reimbursement, causing Medicaid to pay more than it should. Therefore, when manufacturers charge inflated Ceiling Prices, they cause false claims to be submitted with respect to Medicaid FFS patients.

## VII.  THE FRAUDULENT SCHEME

125. For years, Defendants have knowingly and intentionally provided materially false and deceptive reports to HHS concerning their Ceiling Prices and their compliance with their PPA obligations. For years, Defendants have knowingly and intentionally charged materially false, unlawfully inflated prices for their drugs. Defendants' fraudulent scheme has caused the federal and state governments to wrongly pay hundreds of millions of dollars.

### A.    Scope of Liability

126. Defendants have violated the FCA and the State FCAs in three basic ways. First, Defendants have overcharged Medicaid for 340B Program drugs used to treat Medicaid FFS patients. Second, Defendants have overcharged government-funded 340B Covered Entities. Third, Defendants have overcharged Medicare by

44

reporting inflated Ceiling Prices to critical access hospitals ("CAHs").

**1.      Medicaid FFS**

a.      Retail Medicaid FFS Subject to AAC Since April 2017

127.   State Medicaid programs' policies vary in whether they allow Covered Entities to use 340B Program drugs for Medicaid beneficiaries.  Forty-five states allow Covered Entities to decide whether to "carve in" 340B Program drugs for Medicaid beneficiaries at their in-house pharmacies and for provider-administered drugs.   Gov't Accountability Office, *340B DRUG DISCOUNT PROGRAM: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement* 14 (Jan. 2020), *available at* https://www.gao.gov/assets/gao-20-212.pdf.  Two states, California and Illinois, are so-called "mandatory carve-in" states, requiring Covered Entities to use 340B prices for all Medicaid FFS claims. *Id.* at 35.

128.   Because the CMS Covered Outpatient Drug Rule has mandated since April 2017 that 340B Program drugs used for retail Medicaid FFS must be reimbursed at AAC, every retail Medicaid FFS 340B drug that has been subject to Defendants' overcharges has also subjected the Medicaid program to a false or fraudulent claim.

b.      Medicaid FFS Subject to AAC by State Law

129.   Prior to April 2017, many states have required AAC reimbursement for Medicaid FFS drugs.  These states include:

- California, effective Nov. 8, 2016, following litigation.  Cal. Welf. & Inst. Code § 14105.46; *Aids Healthcare Found. v. Douglas*, 666 F. App'x 601, 604 (9th Cir. 2016).

- Illinois, effective June 14, 2012.  305 Ill. Comp. Stat. § 5/5-5.12(b), (l).

- New York, effective July 23, 2015.  N.Y. State Dep't of Health, *NYS Medicaid Fee-for-Service NCPDP D.0 Billing Changes for 340B Drug Claims*,  https://www.health.ny.gov/health_care/medicaid/program/update/2015/2015-07.htm#dd0 (last visited Apr. 30, 2021).

45

- North Dakota, effective October 16, 2016.  CMS, *N.D. State Plan Amendment ND-16-0011* (Feb. 14, 2017), https://www.medicaid.gov/sites/default/files/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/ND/ND-16-0011.pdf.

- Texas, effective June 1, 2016.  *Tex. State Plan Amendment TX-15-005* (Feb. 6, 2017), https://www.medicaid.gov/sites/default/files/State-resource-center/Medicaid-State-Plan-Amendments/Downloads/TX/TX-15-005.pdf.

130.  Importantly, in all of these states except Texas, the AAC reimbursement restriction applies not only to retail drugs, but also to non-retail drugs such as infusion products, drugs used in hospital outpatient departments, and physician-administered drugs.  Defendants' overcharges for their covered drugs in these states prior to April 2017 have subjected these state Medicaid programs to false or fraudulent claims actionable under their State FCAs.

131.  For the mandatory carve-in states, California and Illinois, all of their Medicaid FFS drug purchases, both retail and non-retail, are subject to the 340B Program Ceiling Prices.  As such, Defendants' overcharges for their covered drugs have subjected these state Medicaid programs to false or fraudulent claims actionable under their State FCAs.

### 2.    Government-Funded 340B Covered Entities

#### a.    Federally Funded 340B Covered Entities

132.  Certain 340B Covered Entities, such as Community Health Centers, 42 U.S.C. § 254b(e)(1)(A), Title X Family Planning Projects, *id.* §§ 300, 300a-4, Ryan White clinics, *id.* §§ 300ff *et seq.*, and Urban Indian Health Centers, 25 U.S.C. § 1651, are funded in whole or in part by federal funds.

133.  Inflated costs of purchasing 340B Program drugs as a result of the Manufacturer Defendants' fraud has impacted the amount of federal grant funding received by these Covered Entities. Because these Covered Entities use federal funds for the purchase of Defendants' 340B Program drugs which have been subject to

overcharges, those overcharges also result in false or fraudulent claims under the FCA.

b.    State or Locally Funded 340B Covered Entities

134.  Many 340B Covered Entities are owned by state or local government and/or funded in whole or in part by state or local funds.  For example, virtually every state, county and city health department participates in the 340B Program. Because these Covered Entities use state and/or local funds for the purchase of 340B Program drugs that were subject to an overcharge by Defendants, those overcharges have resulted in false or fraudulent claims under the State FCAs.

**3.    Critical Access Hospitals Billing to Medicare**

135.  CAHs bill Medicare based on actual drug costs.  CAHs receive Medicare reimbursement at 101% of cost for outpatient Part B services.  42 U.S.C. § 1395f(*l*); *see also* CMS, *Critical Access Hospital* 3 (July 2019), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/CritAccessHospfctsht.pdf.

136.  Because CAHs bill Medicare at a direct proportion of their drug costs, an increase in the cost of 340B Program drugs means an increase in what Medicare Part B pays.  Thus, overcharged 340B drug purchases billed to Medicare Part B by CAHs also result in false or fraudulent claims to a federal program actionable under the FCA.

**B.    Defendants Have Failed to Charge Accurate Ceiling Prices**

137.  Defendants have systematically failed to report accurate 340B Ceiling Prices for their drugs and, in turn, have for years charged Covered Entities, as well as Medicare and Medicaid Programs using 340B Prices, unlawfully inflated prices for their drugs.

138.  One of the most egregious circumstances of Defendants' overcharges under the 340B statute relates to instances which are subject to the inflationary

penalty because the manufacturer has raised the price of the drug faster than the rate of inflation. In circumstances in which the 340B statutory formula would reduce the Ceiling Price to a penny or less, the unambiguous text of the 340B statute requires that Defendants charge 340B Covered Entities $0.01 per unit. Defendants have systematically failed to abide by this unambiguous statutory mandate.

139. Covered Entities, including Relator Adventist Health, as well as Medicare and Medicaid programs using 340B pricing, paid for Defendants' drugs based on the fraudulent 340B prices reported and charged by Defendants.

140. Defendants' knowing and intentional pattern of fraudulent conduct in overcharging for their drugs directly caused 340B entities, as well as Medicare and Medicaid programs using 340B prices, to substantially overpay for those drugs.

141. As detailed below, these overpayments were manifested in two contexts, both of which were well known and understood by each of the Defendants as a violation of the 340B statute and their PPAs, and thereby causing false claims to be submitted to the United States and the Whistleblower States:

- Failing to charge accurate Ceiling Prices before January 1, 2019, despite a clear statutory mandate to use the 340B penny price formula in all circumstances;

- Failing to charge accurate Ceiling Prices after Q1 2019, despite a regulation from HHS regarding the 340B statutory penny pricing formula.

142. Due to acts of concealment by each Defendant, the following examples of the specific unlawful conduct are merely illustrative. They are not intended to be an exhaustive account of all of the unlawful activity engaged in by each Defendant. Instead, these allegations allege the circumstances of the wrongdoing with some detail. Additional detail is peculiarly within each Defendants' control and warrants that further discovery should proceed as to each drug identified in this Complaint as

48

well as other 340B Program drugs sold by each Defendant that failed to comply with the inflationary penalty.

### 1.    Unlawfully Inflated Ceiling Prices Prior to 2019

143.   Even though most other manufacturers had complied with the 340B statutory penny pricing formula both before and after January 1, 2019, six of the Defendants—AbbVie, Alcon, AstraZeneca, Eli Lilly, Novartis, and Sanofi—failed to comply until the first quarter of January 1, 2019.

144.   These manufacturers have failed to reimburse 340B Covered Entities, as well as Medicare and Medicaid Programs using 340B pricing, for overcharges within 120 days, as they were required to do.

145.   The following tables show per-package pricing—that is, the price of a container that contains one or more units of a drug.  Some packages, such as a bottle of pills or a vial of medication, contain multiple dosage units.   In these circumstances, a per-unit penny price will result in a package price greater than $0.01.  Other packages, such as a pen-style injector or inhaler, might contain only one unit.  In these circumstances, the package price will match the unit price.

146.   The following table shows steep drops in the 340B prices for many of these Defendants' drugs beginning in the first quarter of 2019.  However, the Ceiling Price formula is imposed by statute, not regulation, and the requirement to follow the statute has always been clear.  Therefore, although HHS's rule cementing the 340B statutory penny pricing formula did not take effect until January 1, 2019, manufacturers were obligated to comply with that policy since the inception of the 340B Program:

| Defendant | Label Name | 340B Package Price | | Overcharge |
| | | Q4 2018 | Q1 2019 | |
|---|---|---|---|---|
| Eli Lilly | Forteo 600 mcg/2.4 ml Pen Inj | $312.58 | $0.02 | 1,562,900% |
| AstraZeneca | Byetta 5 mcg Dose Pen Inj | $17.86 | $0.01 | 178,600% |
| Novartis | Omnitrope 10 MG/1.5 ML CRTG | $26.72 | $0.02 | 133,600% |
| Novartis | Omnitrope 5 MG/1.5 ML CRTG | $26.72 | $0.02 | 128,050% |
| Sanofi | Apidra Solostar 100 Units/ml | $201.53 | $0.15 | 134,353% |

| Defendant | Label Name | 340B Package Price | | Overcharge |
|---|---|---|---|---|
| | | Q4 2018 | Q1 2019 | |
| Sanofi | Apidra 100 Units/ml Vial | $104.32 | $0.10 | 104,320% |
| Sanofi | Lantus Solostar 100 Unit/ml | $133.38 | $0.15 | 88,920% |
| Sanofi | Lantus 100 Unit/ml Vial | $88.92 | $0.10 | 88,920% |
| Eli Lilly | Humulin R 500 Unit/ml Kwikpen | $50.74 | $0.06 | 84,567% |
| Eli Lilly | Cialis 10 mg Tablet | $202.15 | $0.30 | 67,383% |
| Eli Lilly | Cialis 20 mg Tablet | $201.98 | $0.30 | 67,327% |
| Sanofi | Renvela 2.4 gm Powder Packet | $563.08 | $0.90 | 62,564% |
| Sanofi | Ambien 10 mg Tablet | $585.10 | $1.00 | 58,510% |
| Sanofi | Ambien 5 mg Tablet | $585.10 | $1.00 | 58,510% |
| AstraZeneca | Pulmicort 180 mcg Flexhaler | $5.42 | $0.01 | 54200% |
| AstraZeneca | Symbicort 160-4.5 mcg Inhaler | $51.68 | $0.10 | 51,680% |
| AstraZeneca | Symbicort 160-4.5 mcg Inhaler | $30.40 | $0.06 | 50,667% |
| Sanofi | Renagel 800 mg Tablet | $750.85 | $1.80 | 41,714% |
| AstraZeneca | Pulmicort 90 mcg Flexhaler | $3.80 | $0.01 | 38,000% |
| AstraZeneca | Symlinpen 60 Pen Injector | $11.34 | $0.03 | 37,800% |
| AstraZeneca | Byetta 10 mcg Dose Pen Inj | $7.30 | $0.02 | 36,500% |
| AstraZeneca | Symbicort 80-4.5 mcg Inhaler | $31.75 | $0.10 | 31,750% |
| Sanofi | Renvela 800 mg Tablet | $576.88 | $.90 | 21,366% |
| Alcon | Travatan Z 0.004% Eye Drop | $10.12 | $0.05 | 20,240% |
| AstraZeneca | Farxiga 10 mg Tablet | $59.00 | $0.30 | 19,667% |
| AstraZeneca | Farxiga 5 mg Tablet | $58.48 | $0.30 | 19,493% |
| AstraZeneca | Symlinpen 120 Pen Injector | $8.21 | $0.05 | 16,420% |
| Sanofi | Amaryl 2 mg Tablet | $158.03 | $1.00 | 15,803% |
| AstraZeneca | Onglyza 5 mg Tablet | $114.69 | $0.90 | 12,743% |
| AstraZeneca | Onglyza 5 mg Tablet | $38.23 | $0.30 | 12,743% |
| Sanofi | Amaryl 1 mg Tablet | $96.98 | $1.00 | 9,698% |
| Allergan | Linzess 145 mcg Capsule | $19.07 | $0.30 | 6,357% |
| Allergan | Linzess 290 mcg Capsule | $17.96 | $0.30 | 5,987% |
| AstraZeneca | Kombiglyze XR 5-500 mg Tablet | $11.66 | $0.30 | 3,887% |
| AstraZeneca | Kombiglyze XR 5-1,000 mg Tab | $11.25 | $0.30 | 3,750% |
| Novartis | Diovan 320 mg Tablet | $26.33 | $0.90 | 2,926% |
| Alcon | Azopt 1% Eye Drops | $3.63 | $0.15 | 2,420% |
| Alcon | Azopt 1% Eye Drops | $2.42 | $0.10 | 2,420% |
| Novartis | Exforge 10-160 mg Tablet | $6.17 | $0.30 | 2,057% |
| Novartis | Lotrel 5-20 mg Capsule | $18.61 | $1.00 | 1,861% |
| AstraZeneca | Kombiglyze XR 2.5-1,000 mg Tab | $10.55 | $0.60 | 1,758% |
| Novartis | Tegretol XR 200 mg Tablet | $15.21 | $1.00 | 1,521% |
| AstraZeneca | Nexium Dr 20 mg Packet | $4.39 | $0.30 | 1,463% |
| Alcon | Maxidex 0.1% Eye Drops | $0.66 | $0.05 | 1,320% |
| Novartis | Lotrel 5-10 mg Capsule | $11.65 | $1.00 | 1,165% |
| Alcon | Cipro Hc Otic Suspension | $1.10 | $0.10 | 1,100% |
| Novartis | Diovan 80 mg Tablet | $9.60 | $0.90 | 1,067% |
| Novartis | Diovan 40 mg Tablet | $2.85 | $0.30 | 950% |
| Alcon | Betoptic S 0.25% Eye Drops | $0.81 | $0.10 | 810% |
| Alcon | Betoptic S 0.25% Eye Drops | $1.21 | $0.15 | 807% |
| Alcon | Tobrex 0.3% Eye Drop | $0.33 | $0.05 | 660% |
| Novartis | Diovan Hct 80-12.5 mg Tablet | $4.93 | $0.90 | 548% |
| AstraZeneca | Onglyza 2.5 mg Tablet | $4.15 | $0.90 | 461% |
| AstraZeneca | Onglyza 2.5 mg Tablet | $1.38 | $0.30 | 460% |

| Defendant | Label Name | 340B Package Price | | Overcharge |
| --- | --- | --- | --- | --- |
| | | Q4 2018 | Q1 2019 | |
| Novartis | Diovan Hct 160-25 mg Tablet | $3.39 | $0.90 | 377% |
| AstraZeneca | Nexium Dr 40 mg Packet | $0.95 | $0.30 | 317% |

147.  These price discrepancies are not the result of a sudden increase in AMP or decrease in best price leading to a large URA beginning in 2019.  Rather, the 340B prices these Defendants began charging in the first quarter of 2019 are the prices they were required by the 340B statutory penny pricing formula to have been charging all along.  These Defendants' sudden price shifts betray a belated attempt to comply with the 340B statutory formula and demonstrate that their previous (much higher) prices were inflated and did not reflect accurate 340B statutory penny prices.

**2.    Unlawfully Inflated Ceiling Prices After January 1, 2019**

a.    <u>Unlawfully Inflated Ceiling Prices through Q1 2019</u>

148.  Numerous manufacturers did not even comply with the 340B statutory penny pricing formula even after HHS's rule took effect on January 1, 2019.  Even though most other manufacturers had provided accurate 340B Ceiling Prices prior to 2019, four of the Defendants—AbbVie, GSK, Novartis, and Sanofi—failed to comply for a number of their drugs until the second quarter of 2019.

149.  For all of these drugs, even though they were required under the law and their PPAs to reimburse overcharges within 120 days, these companies (with the exception of GSK, which issued refunds for some of its drugs for Q1 2019) have failed to reimburse Covered Entities the 340B overcharges not just for quarters prior to January 1, 2019, but for the first quarter of 2019, even after the penny pricing regulation took effect on January 1:

| Defendant | Label Name | 340B Package Price | | Overcharge |
| --- | --- | --- | --- | --- |
| | | Q1 2019 | Q2 2019 | |
| GSK | Lamictal XR Start Kit (Green) | $184.71 | $0.01 | 1,847,100% |
| GSK | Lamictal ODT Start Kit (Green) | $159.39 | $0.01 | 1,593,900% |
| GSK | Lamictal XR Start Kit (Orange) | $80.93 | $0.01 | 809,300% |

51

| Defendant | Label Name | 340B Package Price | | Overcharge |
|---|---|---|---|---|
| | | Q1 2019 | Q2 2019 | |
| GSK | Lamictal ODT Start Kit (Orange) | $80.32 | $0.01 | 803,200% |
| GSK | Lamictal XR Start Kit (Blue) | $57.69 | $0.01 | 576,900% |
| GSK | Lamictal ODT Start Kit (Blue) | $55.52 | $0.01 | 555,200% |
| GSK | Lamictal XR 300 mg Tablet | $164.56 | $0.30 | 54,853% |
| GSK | Lamictal XR 250 mg Tablet | $149.99 | $0.30 | 49,997% |
| AbbVie | Namzaric 21 mg-10 mg Capsule | $122.71 | $0.30 | 40,903% |
| GSK | Lamictal XR 200 mg Tablet | $109.70 | $0.30 | 36,567% |
| GSK | Lamictal XR 100 mg Tablet | $102.88 | $0.30 | 34,293% |
| GSK | Lamictal XR 50 mg Tablet | $96.32 | $0.30 | 32,107% |
| AbbVie | Fetzima Er 80 mg Capsule | $87.62 | $0.30 | 29,207% |
| AbbVie | Fetzima Er 20 mg Capsule | $87.60 | $0.30 | 29,200% |
| AbbVie | Fetzima Er 120 mg Capsule | $87.58 | $0.30 | 29,193% |
| AbbVie | Fetzima 20-40 mg Titration Pack | $73.48 | $0.28 | 26,243% |
| AbbVie | Fetzima Er 40 mg Capsule | $62.93 | $0.30 | 20,977% |
| GSK | Lamictal ODT 200 mg Tablet | $62.74 | $0.30 | 20,913% |
| GSK | Lamictal ODT 100 mg Tablet | $52.53 | $0.30 | 17,510% |
| GSK | Lamictal ODT 50 mg Tablet | $49.30 | $0.30 | 16,433% |
| GSK | Lamictal XR 25 mg Tablet | $48.36 | $0.30 | 16,120% |
| GSK | Lamictal ODT 25 mg Tablet | $46.03 | $0.30 | 15,343% |
| Novartis | Focalin XR 30 mg Capsule | $55.00 | $1.00 | 5,500% |
| AbbVie | Depakote ER 250 mg Tablet | $36.88 | $1.00 | 3,688% |
| AbbVie | Depakote ER 250 mg Tablet | $36.88 | $1.00 | 3,688% |
| Novartis | Tegretol XR 400 mg Tablet | $7.11 | $1.00 | 711% |
| Sanofi | Ambien CR 6.25 mg Tablet | $6.83 | $1.00 | 683% |
| Sanofi | Zolpidem Tartrate ER 6.25 mg Tab | $6.83 | $1.00 | 683% |
| Sanofi | Ambien CR 12.5 mg Tablet | $4.70 | $1.00 | 470% |
| Sanofi | Zolpidem Tartrate ER 12.5 mg Tab | $4.70 | $1.00 | 470% |

150.   These price discrepancies are not the result of a sudden increase in AMP or decrease in best price leading to a large URA beginning in the second quarter of 2019.  Rather, the 340B prices these Defendants began charging in the second quarter of 2019 are the prices they were required by the 340B statutory penny pricing formula to have been charging all along.  These Defendants' sudden price shifts betray a belated attempt to comply with the 340B statutory formula and demonstrate that their previous (much higher) prices were inflated and did not reflect accurate Ceiling Prices.

b.    Unlawfully Inflated Ceiling Prices through Q2 2019

151.   Several manufacturers failed to comply with the 340B statutory penny pricing formula for the entire first half of 2019.   Even though most other

52

manufacturers had provided accurate 340B Ceiling Prices prior to 2019, four of the Defendants—AbbVie, AstraZeneca, GSK, and Novartis—failed to comply for a number of their drugs until the third quarter of 2009.

152.   For all of these drugs, even though they were required under the law and their PPAs to reimburse overcharges within 120 days, these companies (with the exception of GSK, which issued refunds for some of its drugs for Q1 2019) have failed to reimburse Covered Entities the 340B overcharges not just for quarters prior to January 1, 2019, but for the first and second quarters of 2019, even after the Final Rule took effect on January 1:

| Defendant | Label Name | 340B Package Price | | Overcharge |
|-----------|------------|---------|---------|------------|
| | | Q2 2019 | Q3 2019 | |
| AbbVie | Latisse 0.03% Eyelash Solution | $14.90 | $0.05 | 29,800% |
| AbbVie | Latisse 0.03% Eyelash Solution | $8.94 | $0.03 | 29,800% |
| AstraZeneca | Xigduo CR 5 mg-500 mg Tablet | $25.63 | $0.30 | 8,543% |
| AstraZeneca | Xigduo CR 5 mg-1,000 mg Tablet | $29.14 | $0.60 | 4,857% |
| AbbVie | Zenpep DR 15,000 Unit Capsule | $17.00 | $1.00 | 1,700% |
| Novartis | Trileptal 600 mg Tablet | $11.81 | $1.00 | 1,181% |
| Novartis | Trileptal 300 mg Tablet | $6.78 | $1.00 | 678% |
| AbbVie | Lexapro 10 mg Tablet | $6.00 | $1.00 | 600% |
| AbbVie | Lexapro 20 mg Tablet | $6.00 | $1.00 | 600% |
| AbbVie | Lexapro 5 mg Tablet | $6.00 | $1.00 | 600% |
| Novartis | Trileptal 150 mg Tablet | $3.60 | $1.00 | 360% |

153.   These price discrepancies are not the result of a sudden increase in AMP or decrease in best price leading to a large URA beginning in the third quarter of 2019.   Rather, the 340B prices these Defendants began charging in the third quarter of 2019 are the prices they were required by the 340B statutory penny pricing formula to have been charging all along.   These Defendants' sudden price shifts betray a belated attempt to comply with the 340B statutory formula and demonstrate that their previous (much higher) prices were inflated and did not reflect accurate Ceiling Prices.

       c.     Unlawfully Inflated Ceiling Prices through Q3 2019

154.   Some manufacturers failed to comply with the 340B statutory penny pricing formula through the third quarter of 2019.   Even though most other

manufacturers had provided accurate 340B Ceiling Prices prior to 2019, two of the Defendants—AbbVie and Novartis—failed to comply for a number of their drugs until the fourth quarter of 2009.

155.  For all of these drugs, even though they were required under the law and their PPAs to reimburse overcharges within 120 days, these companies have failed to reimburse Covered Entities the 340B overcharges not just for quarters prior to January 1, 2019, but for the first, second, and third quarters of 2019, even after the Final Rule took effect on January 1:

| Defendant | Label Name | 340B Package Price | | Overcharge |
| --- | --- | --- | --- | --- |
| | | Q3 2019 | Q4 2019 | |
| Novartis | Focalin XR 15 mg Capsule | $54.60 | $1.00 | 5,460% |
| Novartis | Focalin XR 10 mg Capsule | $50.53 | $1.00 | 5,053% |
| AbbVie | Namzaric 28 mg-10 mg Capsule | $1.93 | $0.30 | 643% |

156.  These price discrepancies are not the result of a sudden increase in AMP or decrease in best price leading to a large URA beginning in the fourth quarter of 2019.  Rather, the 340B prices these Defendants began charging in the fourth quarter of 2019 are the prices they were required by the 340B statutory penny pricing formula to have been charging all along.  These Defendants' sudden price shifts betray a belated attempt to comply with the 340B statutory formula and demonstrate that their previous (much higher) prices were inflated and did not reflect accurate Ceiling Prices.

C.    **Defendants Intentionally Disregarded the 340B Statutory Formula**

1.    **AbbVie**

157.  AbbVie signed its PPA with HHS on January 4, 1993 and its PPA Addendum on December 13, 2016.

158.  AbbVie has concealed that it has been charging Covered Entities, as well as Medicaid and Medicare programs using 340B prices, unlawfully inflated prices for a number of its drugs, overcharging millions of dollars for these drugs.

159.  On April 19, 2017, April Gerzel, Director of Public Payer Markets at

AbbVie, wrote to HHS, commenting on the proposed Penny Pricing Rule. Gerzel complained that the proposed Penny Pricing Rule was "grossly unfair" to drug makers like AbbVie and "arguably" an "unconstitutional taking."

160. On November 21, 2018, Gerzel again wrote to complain about the Penny Pricing Rule, stating: "The penny pricing policy is not a permissible or reasonable interpretation of the 340B statute, and because HRSA has failed to address program abuses and protect program integrity, there is no meaningful nexus between the regulatory conditions imposed by the rule and the forced transfer of manufacturers' drugs to covered entities."

161. As explained above, these comments contradicted the unambiguous language of the 340B statute and reflected an objectively unreasonable interpretation of the statute. *See supra* ¶¶ 97-109.

162. On February 26, 2019, AbbVie's Chairman and CEO, Richard A. Gonzalez, testified before the Senate Committee on Finance that many of its drugs had hit the 100% AMP rebate cap under the MDRP, including Depakote ER 250.

### a. Depakote ER

163. AbbVie's drug Depakote ER, used to treat seizure disorders, mental/mood conditions (such as manic phase of bipolar disorder), and prevent migraine headaches, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2012 to 2016, Medicaid programs paid $109,691,448 for Depakote ER.

164. Despite acknowledging that AbbVie had hit the MDRP rebate cap for Depakote ER in Q1 2015 and Q4 2018, AbbVie refused to apply this URA to its drugs sold through the 340B Program, concealing the accurate Ceiling Price. Nor has AbbVie refunded the overcharges on Depakote ER to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

165. From Q1 2016 (if not much earlier) through Q1 2019, AbbVie charged

Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Depakote ER ranging from $4.99 (Q1 2016) to $36.88 (Q1 2019) per package, or as high as 3,688% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AbbVie begin charging the statutorily mandated penny Ceiling Price ($1.00 per package) for Depakote ER, a price that has stayed consistent through the second quarter of 2021. AbbVie has not refunded the Depakote ER overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

b.    Fetzima

166. AbbVie's drug Fetzima, an antidepressant used to treat major depressive disorder in adults, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2012 to 2016, Medicaid programs paid $83,544,817 for Fetzima.

167. Fetzima comes in five strengths: Fetzima 20-40 mg titration pack, Fetzima ER 20 mg capsule, Fetzima ER 40 mg capsule, Fetzima ER 80 mg capsule, and Fetzima ER 120 mg capsule.

168. From Q1 2016 (if not much earlier) through Q1 2019, Allergan (now owned by AbbVie) charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Fetzima 20-40 mg titration pack ranging from $91.51 (Q1 2016) to $73.48 (Q1 2019) per package, or as high as 32,682% of the statutorily mandated penny Ceiling Price. Not until the second quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($0.28 per package) for Fetzima 20-40 mg titration pack, a price that has stayed consistent through the second quarter of 2021. Allergan has not refunded the Fetzima 20-40 mg titration pack overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

169. From Q1 2016 (if not much earlier) through Q1 2019, Allergan charged

56

Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Fetzima ER 20 mg capsule ranging from $105.16 (Q1 2016) to $87.58 (Q1 2019) per package, or as high as 35,053% of the statutorily mandated penny Ceiling Price. Not until the second quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Fetzima ER 20 mg capsule, a price that has stayed consistent through the second quarter of 2021. Allergan has not refunded the Fetzima ER 20 mg capsule overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

170. From Q1 2016 (if not much earlier) through Q1 2019, Allergan charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Fetzima ER 40 mg capsule ranging from $80.31 (Q1 2016) to $62.93 (Q1 2019) per package, or as high as 26,770% of the statutorily mandated penny Ceiling Price. Not until the second quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Fetzima ER 40 mg capsule, a price that has stayed consistent through the second quarter of 2021. Allergan has not refunded the Fetzima ER 40 mg capsule overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

171. From Q1 2016 (if not much earlier) through Q1 2019, Allergan charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Fetzima ER 80 mg capsule ranging from $106.11 (Q1 2016) to $87.62 (Q1 2019) per package, or as high as 35,370% of the statutorily mandated penny Ceiling Price. Not until the second quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Fetzima ER 80 mg capsule, a price that has stayed consistent through the second quarter of 2021. Allergan has not refunded the Fetzima ER 80 MG capsule

overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

172. From Q1 2016 (if not much earlier) through Q1 2019, Allergan charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Fetzima ER 120 mg capsule ranging from $103.94 (Q1 2016) to $87.58 (Q1 2019) per package, or as high as 34,647% of the statutorily mandated penny Ceiling Price. Not until the second quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Fetzima ER 120 mg capsule, a price that has stayed consistent through the second quarter of 2021. Allergan has not refunded the Fetzima ER 120 mg capsule overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

### c.    Lexapro

173. AbbVie's drug Lexapro, mainly used to treat major depressive disorder or generalized anxiety disorder, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2012 to 2016, Medicaid programs paid $179,024,817.90 for Lexapro.

174. Lexapro comes in three strengths: 5 mg, 10 mg, and 20 mg tablets.

175. The annual growth rate in the cost per dosage unit of Lexapro between 2012 and 2016 was 15.9%, far higher than the average CPI-U rate of inflation during this time period, 1.47%.

176. From Q1 2016 (if not much earlier) through Q2 2019, Allergan (now owned by AbbVie) charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Lexapro 5 mg tablets ranging from $45.39 (Q1 2016) to $6.00 (Q2 2019) per package, or as high as 4,539% of the statutorily mandated penny Ceiling Price. Not until the third quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price

($1.00 per package) for Lexapro 5 mg tablets, a price that has stayed consistent through the second quarter of 2021. Allergan has not refunded the Lexapro 5 mg overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

177. From Q1 2016 (if not much earlier) through Q2 2019, Allergan charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Lexapro 10 mg tablets ranging from $46.39 (Q1 2016) to $6.00 (Q2 2019) per package, or 4,639% of the statutorily mandated penny Ceiling Price. Not until the third quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($1.00 per package) for Lexapro 10 mg tablets, a price that has stayed consistent through the second quarter of 2021. Allergan has not refunded the Lexapro 10 mg overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

178. From Q1 2016 (if not much earlier) through Q2 2019, Allergan charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Lexapro 20 mg tablets ranging from $48.55 (Q1 2016) to $6.00 per package, or 4,855% of the statutorily mandated penny Ceiling Price. Not until the third quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($1.00 per package) for Lexapro 20 mg tablets, a price that has stayed consistent through the second quarter of 2021. Allergan has not refunded the Lexapro 20 mg overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

### d.   Linzess

179. AbbVie's drug Linzess, used to treat Irritable Bowel Syndrome with Constipation, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. Between 2016 and 2018, Medicaid programs paid $311,050,240 for Linzess.

180. Linzess is supplied in 3 different product strengths: 145 mcg and 290 mcg, available since 2012, and a 72 mcg line extension strength, which was introduced in 2017. Each product strength has its own 9-digit NDC and Ceiling Price. The 145 mcg and 290 mcg strengths are subject to penny prices. The line extension 72 mcg is not subject to a penny price.

181. In the face of increased competition from other branded products, AbbVie (successor to Allergan) has continued to raise the price of Linzess, with the most recent 5% increase in January 2021.

182. From Q1 2016 (if not much earlier) through Q4 2018, Allergan charged Covered Entities, as well as Medicaid and Medicare programs using 340B prices, unlawfully inflated prices for Linzess 145 mcg ranging from $99.96 (Q1 2016) to $19.07 (Q2 2019) per package, or as high as 33,320% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Linzess 145 mcg, a price that has stayed consistent through the second quarter of 2021. AbbVie (successor to Allergan) has not refunded the Linzess 145 mcg overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

183. From Q1 2016 (if not much earlier) through Q4 2018, Allergan charged Covered Entities, as well as Medicaid and Medicare programs using 340B prices, unlawfully inflated prices for Linzess 290 mcg ranging from $98.79 (Q1 2016) to $17.96 (Q4 2018) per package, or as high as 32,930% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Linzess 290 mcg, a price that has stayed consistent through the second quarter of 2021. AbbVie (successor to Allergan) has not refunded the Linzess 290 mcg overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

e.    Zenpep DR

184. AbbVie's drug Zenpep DR, used in conditions where the pancreas cannot make or does not release enough digestive enzymes into the small intestines to digest the food (such as chronic pancreatitis, cystic fibrosis, cancer of the pancreas, post-pancreatectomy, and post-gastrointestinal bypass surgery), has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2015 to 2019, Medicaid programs paid $325,094,458 for Zenpep.

185. Zenpep is dosed by lipase units. Zenpep is available in seven color-coded capsule strengths. Other active ingredients include protease and amylase. Each Zenpep capsule strength contains the specified amounts of lipase, protease, and amylase. Only the Zenpep DR 15,000 unit capsule is subject to a penny price.

186. From Q4 2018 (there is no pricing available for prior quarters) through Q1 2019, Allergan charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Zenpep DR 15,000 unit capsule ranging from $15.32 (Q4 2018) to $17.00 (Q2 2019) per package, or as high as 1700% of the statutorily mandated penny Ceiling Price. Not until the second quarter of 2019 did Allergan begin charging the statutorily mandated penny Ceiling Price ($1.00 per package) for Zenpep DR 15,000 unit capsule, a price that has stayed consistent through the second quarter of 2021. AbbVie (successor to Allergan) has not refunded the Zenpep DR 15,000 unit capsule overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

**2.    Alcon**

187. Alcon signed its PPA with HHS on January 13, 1993 and its PPA Addendum on December 9, 2016.

188. Alcon has concealed that it has been charging Covered Entities, as well as Medicaid and Medicare programs using 340B prices, unlawfully inflated prices

for a number of its drugs, overcharging millions of dollars for these drugs.

189. Alcon's misconduct is exemplified by its pricing with regard to Travatan Z, used to treat high pressure inside the eye. Since it was first marketed, Travatan Z has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $90,744,388 for Travatan Z.

190. Travatan Z is supplied in one strength with two different package sizes (5 ml and 2.5 ml). Because it is one strength, there is only one 9-digit National Drug Code ("NDC"), so the base price is the same, multiplied by different package sizes.

191. The annual growth rate in the cost per dosage unit of Travatan Z between 2014 and 2018 was 10.13%, far higher than the average CPI-U rate of inflation during this time period, 1.62%. From Q1 2016 (if not much earlier) through Q4 2018, Alcon charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Travatan Z at $5.06 per 2.5-ml package and $10.12 per 5-ml package, or 50,600% of the statutorily mandated penny Ceiling Price. Travatan Z's historical pricing, which remained steady for years prior to 2019, indicates that Alcon had unilaterally decided to use an unlawful alternative formula to calculate the 340B Ceiling Price:



**Travatan Z 5 ml**
**NDC: 00065-0260-05**

340B Penny Price Regulation

Identical pricing for multiple quarters indicates an alternative calculation

Current WAC Price    340B Price

192. Not until the first quarter of 2019 did Alcon begin charging the statutorily mandated penny Ceiling Price ($0.01 per 2.5-ml package and $0.05 per 5-ml package) for Travatan Z, a price that has stayed consistent through the second quarter of 2021. Alcon has not refunded the Travatan Z overcharges to Covered Entities, or to Medicare or Medicaid programs using 340B pricing.

### 3.    AstraZeneca

193. Zeneca Pharmaceuticals (predecessor to AstraZeneca) signed its PPA with HHS on January 4, 1993 and its PPA Addendum on December 6, 2016. Astra Pharmaceuticals LP (predecessor to AstraZeneca) signed its PPA with HHS on January 27, 1993 and its PPA Addendum on January 31, 2017.

194. AstraZeneca has concealed that it has been charging Covered Entities, as well as Medicaid and Medicare programs using 340B prices, unlawfully inflated prices for a number of its drugs, overcharging millions of dollars for these drugs.

195. On April 18, 2017, Christie Bloomquist (AstraZeneca's Vice President, Federal Government Affairs & Policy Corporate Affairs), wrote HHS a letter

63

opposing the proposed 340B Final Rule, arguing the 340B regulations were "burdensome and confiscatory," requesting that HHS delay the Final Rule.

196. On May 22, 2018, Bloomquist again wrote HHS, again requesting a delay in implementation of the Final Rule. As explained above, these comments contradicted the unambiguous language of the 340B statute and reflected an objectively unreasonable interpretation of the statute. *See supra* ¶¶ 97-109.

197. On February 26, 2019, AstraZeneca's Executive Director and CEO Pascal Soriot testified before the Senate Committee on Finance that numerous of its drugs had hit the 100% AMP rebate cap under the MDRP, and provided the following chart:

| Product | Q114 | Q214 | Q314 | Q414 | Q115 | Q215 | Q315 | Q415 | Q116 | Q216 | Q316 | Q416 | Q117 | Q217 | Q317 | Q417 | Q118 | Q218 | Q318 | Q418 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FARXIGA | | | | | | | | | | | | | X | X | X | X | X | X | X | X |
| ONGLYZA | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| KOMBIGLYZE | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X |
| SYMBICORT | | | | | | | | | X | X | X | X | X | X | X | X | X | X | X | X |
| PULMICORT FLEXHALER | | | | | | | | | | | | | X | X | X | X | X | X | X | X |
| NEXIUM OS | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| NEXIUM XSULE | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | | X | X | | |
| CRESTOR | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| BYETTA | | | | | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| BYDUREON | | | | | | | | | | | | | | | | | X | X | X | X |
| SYMLIN | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X | X |
| TUDORZA | | | | | | | | | | | | | | | | | X | X | X | X |

X   URA Capped at AMP

198. Despite acknowledging that AstraZeneca had hit the MDRP rebate cap for these drugs, AstraZeneca refused to apply this URA to its drugs sold through the 340B Program, concealing the true Ceiling Price.

### a. Byetta

199. AstraZeneca's drug Byetta, an injectable drug pen used to control blood sugar in people with Type 2 diabetes, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $129,857,897 for Byetta.

200. Byetta comes in two strengths: 5 mcg and 10 mcg.

201. In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Byetta had hit the Medicaid inflationary

penalty cap as of Q1 2015.  By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered Entities $0.01 per unit of Byetta. However, AstraZeneca failed to offer 340B Covered Entities true 340B statutory penny prices for Byetta.

202.  Byetta's historical pricing, which remained steady for years prior to 2019, indicates that AstraZeneca had unilaterally decided to use an unlawful alternative formula to calculate the 340B Ceiling Price:





203. From Q1 2016 (if not much earlier) through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for the 5-mcg formulation of Byetta of $17.86 per package, or 178,600% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.01 per package), a price that has stayed consistent through the second quarter of 2021. From Q1 2016 (if not much earlier) through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for the 10-mcg formulation of Byetta of $7.30 per package, or 36,500% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.02 per package), a price that has stayed consistent through the second quarter of 2021.

204. AstraZeneca has not refunded any of the aforementioned Byetta overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

b.    Bydureon

205. AstraZeneca's drug Bydureon, used to treat diabetes mellitus type 2, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $292,938,292 for Bydureon.

206. On September 14, 2020, AstraZeneca announced that Bydureon (exenatide) Pen would be discontinued as of March 2021.

207. In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Bydureon had hit the Medicaid inflationary penalty cap as of Q1 2018 through Q4 2018. By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered

66

Entities $0.01 per unit of Bydureon.  However, AstraZeneca failed to offer 340B Covered Entities accurate 340B statutory penny prices for Bydureon.

208.  From Q1 2018 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Bydureon 2 mg vial ranging from $12.53 (Q1 2018) to $15.14 (Q4 2018) per package, or as much as 37,850% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.04 per package), a price that has stayed consistent (with the exception of Q3 2019 through Q4 2020 when there was no price) through the second quarter of 2021.

209.  AstraZeneca has not refunded any of the aforementioned Bydureon overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

### c.    Crestor

210.  AstraZeneca's drug Crestor, used to prevent cardiovascular disease and treat abnormal lipids, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing.  From 2014 through 2018, Medicaid programs paid $334,244,639 for Crestor.

211.  Crestor comes in four strengths: 5 mg, 10 mg, 20 mg, and 40 mg.

212.  In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Crestor had hit the Medicaid inflationary penalty cap as of Q1 2014 through Q4 2018.  By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered Entities $0.01 per unit of Crestor.  However, AstraZeneca failed to offer 340B Covered Entities accurate 340B statutory penny prices for Crestor.

213.  From Q1 2014 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully

inflated prices for Crestor 5 mg of $42.38 per package, or 4,709% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.90 per package), a price that has stayed consistent through the third quarter of 2020, a price that held until the second quarter of 2020, when it reverted to the non-penny price.

214. From Q1 2014 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Crestor 10 mg of $42.57 per package, or 4,730% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.90 per package) for Crestor 10 mg, a price that held until the third quarter of 2020, when it reverted to the non-penny price. Crestor's historical pricing, which remained steady for years prior to 2019, indicates that AstraZeneca had unilaterally decided to use an unlawful alternative formula to calculate the 340B Ceiling Price, then again began using an unlawful alternative formula in 2020:



215. From Q1 2014 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Crestor 20 mg of $42.59 per package, or 4,732% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.90 per package) for Crestor 20 mg, a price that held until the third quarter of 2020, when it reverted to the non-penny price.

216. From Q1 2014 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Crestor 40 mg of $14.07 per package, or 4,690% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Crestor 40 mg, a price that held until the third quarter of 2020, when it reverted to the non-penny price.

217. AstraZeneca has not refunded any of the aforementioned Bydureon overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

d.    Farxiga

218. AstraZeneca's drug Farxiga,  used to treat type 2 diabetes, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. In 2017 and 2018, Medicaid programs paid $85,722,285 for Farxiga.

219. There are two strengths of Farxiga: 5 mg and 10 mg.

220. In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Farxiga had hit the Medicaid inflationary penalty cap as of Q1 2017 through Q4 2018. By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered

69

Entities $0.01 per unit of Farxiga.  However, AstraZeneca failed to offer 340B Covered Entities accurate 340B statutory penny prices for Farxiga.

221. From Q1 2017 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Farxiga 5 mg ranging from $69.72 (Q1 2016) to $58.48 (Q4 2018) per package, or as high as 23,240% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Farxiga 5 mg, a price that has stayed consistent through the second quarter of 2021.

222. From Q1 2017 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Farxiga 10 mg ranging from $70.23 (Q1 2016) to $59.00 (Q4 2018) per package, or 23,410% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Farxiga 10 mg, a price that has stayed consistent through the second quarter of 2021.

223. AstraZeneca has not refunded any of the aforementioned Farxiga overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

e. Kombiglyze XR

224. AstraZeneca's drug Kombiglyze XR, used to control high blood sugar in people with type 2 diabetes, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing.  From 2014 to 2018, Medicaid programs paid $69,571,857.78 for Kombiglyze XR.

225. Kombiglyze XR comes in three strengths: 2.5-1,000 mg tab, 5-1,000 mg tab, and 5-500 mg tab.

226. In his written responses to questions from the Senate Finance

Committee, CEO Soriot acknowledged that Kombiglyze XR had hit the Medicaid inflationary penalty cap as of Q1 2017. By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered Entities $0.01 per unit of Kombiglyze XR. However, AstraZeneca failed to offer Covered Entities accurate 340B statutory penny prices for Kombiglyze XR.

227. From Q1 2016 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Kombiglyze 2.5-1,000 mg tab that ranged from $11.25 (Q3 2016) to $10.55 (Q4 2018) per package, or as much as 3,750% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Kombiglyze 2.5-1,000 mg tab, a price that has stayed consistent through the second quarter of 2021.

228. From Q1 2016 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Kombiglyze 5-1,000 mg tab of $11.25 per package, or 3,750% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Kombiglyze 5-1,000 mg tab, a price that has stayed consistent through the second quarter of 2021.

229. From Q1 2016 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Kombiglyze 5-500 mg tab of $11.66 per package, or 3,887% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Kombiglyze 5-500 mg tab, a price that has stayed consistent through the second quarter of 2021.

230. AstraZeneca has not refunded any of the aforementioned Kombiglyze overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

### f.   Nexium

231. AstraZeneca's drug Nexium, used to reduce stomach acid, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing.   From 2014 through 2018, Medicaid programs paid $834,531,644 for Nexium.

232. In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Nexium had hit the Medicaid inflationary penalty cap as of Q1 2014 through Q4 2018.  By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered Entities $0.01 per unit of Nexium.  However, AstraZeneca failed to offer Covered Entities accurate 340B statutory penny prices for Nexium.

233. From Q1 2016 (if not much earlier) through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Nexium DR 10 mg packet of $8.60 per package, or 2,867% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Nexium DR 10 mg packet, a price that has held until Q3 2020 when it reverted to non-penny pricing.

234. From Q1 2016 (if not much earlier) through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Nexium DR 20 mg packet of $4.39 per package, or 1,463% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Nexium DR 20 mg packet, a price that has

stayed consistent through the second quarter of 2021.

235. From Q1 2016 (if not much earlier) through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Nexium DR 40 mg packet of $0.95 per package, or 316% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Nexium DR 40 mg packet, a price that has stayed consistent through the second quarter of 2021.

236. AstraZeneca has not refunded any of the aforementioned Nexium overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

### g.    Onglyza

237. AstraZeneca's drug Onglyza, used for the treatment of type 2 diabetes, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2015 to 2019, Medicaid programs paid $188,467,785 for Onglyza.

238. Onglyza comes in two strengths: 2.5 mg and 5 mg.

239. In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Onglyza had hit the Medicaid inflationary penalty cap as of Q1 2015. By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered Entities $0.01 per unit of Onglyza. However, AstraZeneca failed to offer Covered Entities accurate 340B statutory penny prices for Onglyza.

240. From Q1 2016 (if not much earlier) through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Onglyza 2.5 mg tablet of $1.38 per package, or 460% of the statutorily mandated penny Ceiling Price. Not until the first quarter of

73

2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Onglyza 2.5 mg tablet, a price that has stayed consistent through the second quarter of 2021.

241.  From Q1 2016 (if not much earlier) through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Onglyza 5 mg tablet of $38.23 per package, or 12,743% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Onglyza 5.0 mg tablet, a price that has stayed consistent through the second quarter of 2021.  Historical pricing, which remained steady for years prior to 2019, indicates that AstraZeneca had unilaterally decided to use an unlawful alternative formula to calculate the 340B Ceiling Price:



242.  AstraZeneca has not refunded any of the aforementioned Onglyza overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

h.      Pulmicort Flexhaler

243.   AstraZeneca's drug Pulmicort Flexhaler, used in used in the long-term management of asthma and chronic obstructive pulmonary disease, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing.   From 2014 to 2018, Medicaid programs paid $101,142,754 for Pulmicort Flexhaler.

244.   Pulmicort Flexhaler comes in two strengths: the 90 mcg Flexhaler and the 180 mcg Flexhaler.

245.   In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Pulmicort Flexhaler had hit the Medicaid inflationary penalty cap as of Q1 2017.   By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered Entities $0.01 per unit of Pulmicort Flexhaler.   However, AstraZeneca failed to offer Covered Entities accurate 340B statutory penny prices for Pulmicort Flexhaler.

246.   From Q1 2016 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Pulmicort 90 mcg Flexhaler that ranged from $32.54 (Q1 2016) to $3.80 (Q4 2018) per package, or 325,400% of the statutorily mandated penny Ceiling Price.   Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.01 per package) for Pulmicort 90 mcg Flexhaler, a price that has stayed consistent through the second quarter of 2021.

247.   From Q1 2016 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Pulmicort 180 mcg Flexhaler that ranged from $38.05 (Q 2016) to $5.42 (Q4 2018) per package, or 380,500% of the statutorily mandated penny Ceiling Price.   Not until the first quarter of 2019 did AstraZeneca begin charging the

statutorily mandated penny Ceiling Price ($0.01 per package) for Pulmicort 180 mcg Flexhaler, a price that has stayed consistent through the second quarter of 2021.

248. AstraZeneca has not refunded any of the aforementioned Pulmicort Flexhaler overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

i.    Symbicort

249. AstraZeneca's drug Symbicort, used in the management of asthma or COPD, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing.  From 2014 to 2018, Medicaid programs paid $1,696,946,106 for Symbicort.

250. Symbicort comes in two strengths: 160 mcg budesonide/4.5 mcg formoterol and 80 mcg budesonide/4.5 mcg formoterol).  Each strength has its own 9-digit NDC.

251. In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Symbicort had hit the Medicaid inflationary penalty cap as of Q1 2016.  By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered Entities $0.01 per unit of Symbicort.  However, AstraZeneca failed to offer Covered Entities accurate 340B statutory penny prices for Symbicort.

252. From Q1 2016 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Symbicort 80-4.5 mcg inhaler of $31.75 per package, or 31,750% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.10 per package) for Symbicort 80-4.5 mcg inhaler, a price that has stayed consistent through the second quarter of 2021.

253. From Q1 2016 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Symbicort 160-4.5 mcg inhaler of $51.68 per package, or 51,680% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.10 per package) for Symbicort 160-4.5 mcg inhaler, a price that has stayed consistent through the second quarter of 2021.

254. AstraZeneca has not refunded any of the aforementioned Symbicort overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

### j.    Tudorza Pressair

255. AstraZeneca's drug Tudorza Pressair, used as a maintenance treatment for chronic obstructive pulmonary disease, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2015 to 2019, Medicaid programs paid $134,325,581 for Tudorza Pressair.

256. Tudorza Pressair is supplied in one strength (400 mcg).

257. In his written responses to questions from the Senate Finance Committee, CEO Soriot acknowledged that Tudorza Pressair had hit the Medicaid inflationary penalty cap as of Q1 2018. By hitting the inflationary penalty cap (URA = AMP), AstraZeneca should have charged 340B Covered Entities $0.01 per unit of Tudorza Pressair. However, AstraZeneca failed to offer Covered Entities accurate 340B statutory penny prices for Tudorza Pressair.

258. From Q1 2018 through Q4 2018, AstraZeneca charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Tudorza Pressair of $51.59 per unit, or 515,900% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did AstraZeneca begin charging the statutorily mandated penny Ceiling Price ($0.01 per unit) for

77

Tudorza Pressair, a price that has stayed consistent through the second quarter of 2021.

259. AstraZeneca has not refunded any of the aforementioned Tudorza Pressair overcharges to Covered Entities, or to Medicare and Medicaid programs using 340B pricing.

**4.     Eli Lilly**

260. Eli Lilly signed its PPA with HHS on July 10, 1998, an updated PPA on March 1, 2017, and its PPA Addendum on June 28, 2018.

261. In a letter to HHS dated May 19, 2017, Eli Lilly's Derek Asay, Sr. Director, Government Strategy, and Sean Donohue, Sr. Director, Federal Government Affairs, stated that while it agreed that "a literal interpretation of the statutory text could result in a calculated ceiling price of zero dollars," such a result would be "absurd," arguing instead for the use of nominal pricing.

262. As explained above, these comments contradicted the unambiguous language of the 340B statute and reflected an objectively unreasonable interpretation of the statute. *See supra* ¶¶ 97-109.

263. On September 2, 2020, Eli Lilly announced it would only provide its insulin drugs at the 340B statutory penny price if this was the price charged to patients. *See* Press Release, Eli Lilly, *How Lilly Is Helping Discounts Reach People With Diabetes in 340B* (Sept. 2, 2020), *available at* www.lilly.com/news/stories/lilly-helps-discounts-reach-people-with-diabetes-in-340B.

264. What its Press Release failed to disclose was that for many years Eli Lilly had been charging Covered Entities, as well as Medicaid and Medicare programs using 340B prices, unlawfully inflated prices for a number of its drugs (including its insulin drugs), overcharging millions of dollars for these drugs.

a.     Forteo

265. Eli Lilly's drug Forteo, used to treat osteoporosis, has been heavily used

by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $151,788,597 for Forteo.

266. Forteo is supplied as one strength (with one 9-digit NDC).

267. The annual growth rate in the cost per dosage unit of Forteo between 2014 and 2018 was an astounding 19.28%, far higher than the average CPI-U rate of inflation during this time period, 1.62%. The price of Forteo rose by 68% between 2012 and 2015 alone—the single highest retail price increase for a specialty drug of its kind.

268. From Q1 2016 (if not much earlier) through Q4 2018, Eli Lilly charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Forteo ranging from $202.08 (Q1 2016) to $312.58 (Q4 2018) per package, or as high as 1,562,900% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Eli Lilly begin charging the statutorily mandated penny Ceiling Price ($0.02 per package), a price that has stayed consistent through the second quarter of 2021.

269. On July 20, 2018, Eli Lilly sent a letter to HRSA stating that it had recalculated its 340B prices for a number of its drugs, including Forteo, and that it would be issuing refunds to Covered Entities for Q1 2016 through Q3 2017. Except for these refunds, Eli Lilly has not offered Covered Entities (or Medicare and Medicaid programs using 340B pricing) a refund of the Forteo overcharges.

b.    Humulin R

270. Eli Lilly's drug Humulin R, an insulin medication used to treat diabetes, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $75,804,712 for Humulin R 500 unit/ml Kwikpen.

271. On April 10, 2019, Michael B. Mason (Eli Lilly's Senior Vice President of Connected Care and Insulins) testified before the United States House of

Representatives Committee on Energy and Commerce Subcommittee on Oversight & Investigations. Mason stated that, as a result of the 100% inflationary penalty, Eli Lilly provides its insulin medications "at little or no cost" to Medicaid participants because of the MDRP's inflationary penalty. Even though the 340B statute is subject to the same inflationary penalty, Mason failed to disclose that Eli Lilly was not providing Humulin R 500 unit/ml Kwikpen "at little or no cost" to 340B Covered Entities, or to Medicare or Medicaid programs using 340B prices.

272. From Q1 2016 (if not much earlier) through Q4 2018, Eli Lilly charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Humulin R 500 unit/ml Kwikpen ranging from $38.74 (Q1 2016) to $50.74 (Q4 2018) per package, or as high as 84,567% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Eli Lilly begin charging the statutorily mandated penny Ceiling Price ($0.06 per package) for Humulin R 500 unit/ml Kwikpen, a price that has stayed consistent through the second quarter of 2021.

273. Eli Lilly has not refunded the Humulin R 500 unit/ml Kwikpen overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

**5. GSK**

274. GSK signed its PPA with HHS on January 14, 1993 and its PPA Addendum on January 31, 2017.

275. On April 13, 2015, GSK's John Boone, Vice President Contract Management and Operations, wrote HHS a letter acknowledging that, while the proposed regulations were "consistent with the Agency's statement of its 'penny pricing' policy issued in 2011," it had "serious concerns" and suggested HHS instead adopt other approaches (nominal pricing, FCP pricing, or non-penny pricing based on a prior period's price).

276. In a later letter dated September 19, 2017, Boone argued that the 340B statutory penny price formula was an unconstitutional taking. As explained above, these comments contradicted the unambiguous language of the 340B statute and reflected an objectively unreasonable interpretation of the statute. *See supra* ¶¶ 97-109.

277. GSK has concealed that it has been charging Covered Entities, as well as Medicaid and Medicare programs using 340B prices, unlawfully inflated prices for a number of its drugs, overcharging millions of dollars for these drugs.

### a.    Lamictal XR/Lamictal ODT

278. GSK's drug Lamictal XR/Lamictal ODT, a drug used to treat epilepsy and bipolar disorder, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $227,179,605 for Lamictal XR/Lamictal ODT.

279. The annual growth rate in the cost per dosage unit of Lamictal between 2014 and 2018 ranged between 9.2% (Lamictal ODT) and 30.64% (Lamictal ER Orange), far higher than the average CPI-U rate of inflation during this time period, 1.62%.

280. From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal XR 100 mg tablets ranging from $106.20 (Q3 2016) to $157.09 (Q1 2019) per package, or as high as 35,400% of the statutorily mandated penny Ceiling Price. Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Lamictal XR 100 mg tablets, a price that has stayed consistent through the second quarter of 2021.

281. From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal XR 200 mg tablets ranging from $104.33

81

(Q1 2016) to $112.88 (Q3 2016) per package, or as high as 37,627% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Lamictal XR 100 mg tablets, a price that has stayed consistent through the second quarter of 2021.

282.  From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal XR 300 mg tablets ranging from $156.78 (Q2 2016) to $170.32 (Q3 2016) per package, or as high as 56,773% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Lamictal XR 300 mg tablets, a price that has stayed consistent through the second quarter of 2021.

283.  From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal XR starter kit (blue) ranging from $50.82 (Q3 2016) to $61.33 (Q4 2018) per package, or as high as 613,300% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.01 per package) for Lamictal XR starter kit (blue), a price that has stayed consistent through the second quarter of 2021.

284.  From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal XR starter kit (green) ranging from $153.21 (Q2 2016) to $191.42 (Q4 2016) per package, or as high as 1,914,200% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.01 per package) for Lamictal XR starter kit (green), a price that has stayed consistent through the second quarter of 2021.

285.  From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal XR starter kit (orange) ranging from $76.61 (Q2 2016) to $82.39 (Q3 2016) per package, or as high as 27,463% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Lamictal XR starter kit (orange), a price that has stayed consistent through the second quarter of 2021.

286.  From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal ODT 25 mg tablets ranging from $159.68 (Q3 2016) to $159.39 (Q1 2019) per package, or as high as 53,227% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.30 per unit) for Lamictal ODT 25 mg tablets, a price that has stayed consistent through the second quarter of 2021.

287.  From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal ODT 50 mg tablets ranging from $51.21 (Q3 2016) to $49.30 (Q1 2019) per package, or as high as 17,070% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.30 per unit) for Lamictal ODT 50 mg tablets, a price that has stayed consistent through the second quarter of 2021.

288.  From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal ODT 100 mg tablets ranging from $54.39 (Q3 2016) to $52.53 (Q1 2019) per package, or as high as 18,130% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the

statutorily mandated penny Ceiling Price ($0.30 per unit) for Lamictal ODT 100 mg tablets, a price that has stayed consistent through the second quarter of 2021.

289.    From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal ODT 200 mg tablets ranging from $64.99 (Q3 2016) to $62.74 (Q1 2019) per package, or as high as 21,663% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.30 per unit) for Lamictal ODT 200 mg tablets, a price that has stayed consistent through the second quarter of 2021.

290.    From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal ODT Starter Kit (Blue) ranging from $55.90 (Q3 2016) to $55.52 (Q1 2019) per package, or as high as 559,000% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.01 per unit) for Lamictal Starter Kit (Blue), a price that has stayed consistent through the second quarter of 2021.

291.    From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal ODT Starter Kit (Green) ranging from $159.68 (Q3 2016) to $159.39 (Q1 2019) per package, or as high as 1,596,800% of the statutorily mandated penny Ceiling Price.  Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.01 per unit) for Lamictal Starter Kit (Green), a price that has stayed consistent through the second quarter of 2021.

292.    From Q3 2016 (if not much earlier) through Q1 2019, GSK charged Covered Entities, as well as Medicare and Medicaid programs using 340B prices, unlawfully inflated prices for Lamictal ODT Starter Kit (Orange) ranging from

$78.94 (Q3 2016) to $80.32 (Q1 2019) per package, or as high as 803,200% of the statutorily mandated penny Ceiling Price. Not until Q2 2019 did GSK begin charging the statutorily mandated penny Ceiling Price ($0.01 per unit) for Lamictal Starter Kit (Orange), a price that has stayed consistent through the second quarter of 2021.

293. GSK has not refunded any of the aforementioned Lamictal XR/Lamictal ODT overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

### 6.    Novartis

294. Novartis signed its PPA with HHS on December 30, 1992 and its PPA Addendum on December 14, 2016.

295. Novartis has concealed that it has been charging Covered Entities, as well as Medicaid and Medicare programs using 340B prices, unlawfully inflated prices for a number of its drugs, overcharging millions of dollars for these drugs.

296. On April 14, 2015, Leigh Anne Leas (Vice President and North America Head of Public Policy at Novartis) wrote to HRSA, commenting on the proposed 340B rules. Among other issues, Leas argued that the proposed rules regarding the inflationary penalty were "unlawful," stating that "HRSA does not have rulemaking authority to issue a binding ceiling price regulation, and, thus, the ceiling price calculation provisions of the Proposed Rule would not be binding even if finalized." Leas further argued that "the penny pricing policy is inconsistent with the statutory scheme" because it created a risk of "diversion of controlled substances," was "an absurd result," and "may be unconstitutional." Leas made similar comments in four more letters to HRSA.

297. As explained above, these comments contradicted the unambiguous language of the 340B statute and reflected an objectively unreasonable interpretation of the statute. *See supra* ¶¶ 97-109.

a.   Diovan

298.   Novartis' drug Diovan, used to treat high blood pressure, heart failure, and diabetic kidney disease, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing.  From 2014 to 2018, Medicaid programs paid $129,598,813 for Diovan.

299.   There are two versions of Diovan, each with multiple strengths: original (40 mg, 80 mg, and 320 mg) and HCT (80 mg valsartan/12.5 mg hydrochlorothiazide and 160 mg valsartan/12.5 mg hydrochlorothiazide).

300.   The annual growth rate in the cost per dosage unit of Diovan between 2014 and 2018 was 13.16%, far higher than the average CPI-U rate of inflation during this time period, 1.62%.

301.   From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Diovan 40 mg tablets of $2.85  per package, or 950% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Diovan 40 mg.  Novartis has not refunded the Diovan 40 mg tablets overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

302.   From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Diovan 80 mg tablets of $9.60 per package, or 1,067% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($0.90 per package) for Diovan 80 mg tablet.  Novartis has not refunded the Diovan 80 mg tablets overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

303. From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Diovan 320 mg tablets of $26.33 per package, or 2,926% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($0.90 per package) for Diovan 320 mg tablet. Novartis has not refunded the Diovan 320 mg tablets overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

304. From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Diovan HCT 160-25 mg tablet of $26.33 per package, or 2,925% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($0.90 per package) for Diovan HCT 160-25 mg tablet. Novartis has not refunded the Diovan HCT 160-25 mg tablet overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

305. From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Diovan HCT 80-12.5 mg tablet of $4.93 per package, or 548% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($0.90 per package) for Diovan HCT 80-12.5 mg tablet. Novartis has not refunded the Diovan HCT 80-12.5 mg tablet overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

b. Focalin XR

306. Novartis' drug Focalin XR, used to treat attention deficit hyperactivity disorder (ADHD), has been heavily used by 340B Covered Entities, as well as

Medicare and Medicaid programs using 340B pricing.  From 2014 to 2018, Medicaid programs paid $1,512,523,342 for Focalin XR.

307.  The annual growth rate in the cost per dosage unit of Focalin XR between 2014 and 2018 was 12.95%, far higher than the average CPI-U rate of inflation during this time period, 1.62%.

308.  Focalin XR comes in three strengths: 10 mg, 15 mg, and 20 mg.

309.  From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Focalin XR 10 mg ranging from $110.40 (Q1 2016) to $61.98 (Q4 2018) per package, or as high as 11,040% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($1.00 per package) for Focalin XR 10 mg, a price that held (with the exception of Q3 2019) through the end of 2020, when the price reverted to non-penny price.  Novartis has not refunded the Focalin XR 10 mg overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

310.  From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Focalin XR 15 mg ranging from $95.66 (Q2 2016) to $32.74 (Q4 2018) per package, or as high as 9,566% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($1.00 per package) for Focalin XR 15 mg, a price that held (with the exception of Q3 2019) through the end of 2020, when the price reverted to non-penny price.  Novartis has not refunded the Focalin XR 15 mg overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

311. From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Focalin XR 20 mg ranging from $77.69 (Q1 2016) to $77.67 (Q4 2018) per package, or as high as 7,769% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($1.00 per package) for Focalin XR 20 mg, a price that held through the end of 2020, when the price reverted to non-penny price. Novartis has not refunded the Focalin XR 20 mg overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

### c.   Gleevec

312. Novartis' drug Gleevec, used to treat cancer, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $1,696,946,106 for Gleevec.

313. Since launching a 400 mg tablet of Gleevec in 2003, Novartis raised the price of the drug 22 times. A yearly course of Gleevec is priced at more than $123,000 today compared to just under $25,000 in 2003, an increase of more than 395%. Novartis has raised the price of Gleevec steadily—and at a steeper rate—as it approached its loss of primary patent exclusivity in early 2016. Between 2010 and 2015, Novartis raised the price of Gleevec 12 times. In 2013 alone, the price increased by 20%. S. Fin. Comm., *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 43 n.205, https://www.finance.senate.gov/ imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf.

314. In Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Gleevec 400 mg tablet of $614.32 per package, or 204,773% of the statutorily mandated penny Ceiling Price. Not until Q1 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($0.30 per package) for Gleevec 400 mg tablet, a price

that held only for two quarters until Q3 2019. From Q3 2019 through Q2 2021 the price per package for Gleevec 400 mg tablet has ranged from $779.19 (Q3 2019) to $881.05 (Q2 2021). Novartis has not refunded the Gleevec 400 mg tablet overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

315. From Q1 2016 through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Gleevec 100 mg tablet of $28.82 per package, or 3,202% of the statutorily mandated penny Ceiling Price. Not until Q1 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($0.90 per package) for Gleevec 100 mg tablet, a price that held only for two quarters until Q3 2019. From Q3 2019 through Q2 2021 the price per package for Gleevec 100 mg tablet has ranged from $139.12 (Q3 2019) to $206.19 (Q2 2021). Novartis has not refunded the Gleevec 100 mg tablet overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

### d. Omnitrope

316. Novartis' drug Omnitrope, a growth hormone used to treat children's growth disorders and adult growth hormone deficiency, and marketed by Novartis' subsidiary Sandoz, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $241,594,807 for Omnitrope.

317. Omnitrope is marketed in two strengths: 5 mg and 10 mg.

318. From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Omnitrope 5 mg ranging of $25.61 per package, or 128,050% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price

90

($0.02 per package) for Omnitrope 5 mg, a price that has remained consistent through the second quarter of 2021. Novartis has not refunded the Omnitrope 5 mg overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

319. From Q1 2016 (if not much earlier) through Q4 2018, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Omnitrope 10 mg of $26.72 per package, or 133,600% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($0.02 per package) for Omnitrope 10 mg, a price that has remained consistent through the second quarter of 2021. Novartis has not refunded the Omnitrope 10 mg overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

### e. Trileptal

320. Novartis' drug Trileptal, used to treat epilepsy and bipolar disorder, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $209,794,631 for Trileptal.

321. Trileptal comes in four strengths (150 mg tablet, 300 mg tablet, 600 mg tablet, and 30 mg/5 ml suspension). Of the different versions, Novartis failed to charge the penny price only for the 600 mg strength.

322. The annual growth rate in the cost per dosage unit of Trileptal between 2014 and 2018 was 15.14%, far higher than the average CPI-U rate of inflation during this time period, 1.62%.

323. From Q1 2016 (if not much earlier) through Q2 2019, Novartis charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Trileptal 600 mg ranging from $61.02 (Q1 2016) to $11.81 (Q2 2019) per package, or as high as 6,102% of the statutorily mandated

91

penny Ceiling Price.  Not until Q3 2019 did Novartis begin charging the statutorily mandated penny Ceiling Price ($1.00 per package) for Trileptal 600 mg, a price that remained consistent only through the first quarter of 2021, after which it reverted to the non-penny price.  Novartis has not refunded the Trileptal 600 mg overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

### 7.    Sanofi

324.  Sanofi signed its PPA with HHS on December 29, 1992 and its PPA Addendum on August 14, 2016.

325.  Sanofi has been an outspoken opponent to the 340B Program's statutorily mandated penny pricing, variously declaring it illegal, unconstitutional, inconsistent with the statutory scheme, as well as being arbitrary and capricious.  In a 2015 letter to HRSA, Sanofi said that, even though it had been charging true Ceiling Prices prior to July 1, 2015, it had unilaterally decided to ignore the 340B statutory penny pricing formula.  Instead, the company would charge the Federal Ceiling Price under the Department of Veterans Affairs Federal Supply Schedule program:

> Sanofi's practice to date has been to set its ceiling price at $0.01 per unit when the ceiling price calculates or rounds to zero, in accordance with Release 2011-2.  Sanofi has now reexamined that practice and concluded that penny pricing is not required, and that alternative approaches are permissible.  Accordingly, effective July 1, 2015, Sanofi will adopt the alternative approach of setting a product's 340B ceiling price at  the product's Federal Ceiling Price ("FCP") when the calculated 340B ceiling price equals or rounds to zero.  This letter explains the basis for Sanofi's

Ex. A (ECF 2-2) at 1, *Am. Hosp. Ass'n v. Dep't of Health & Human Servs.*, No. 1:18-cv-02112-JDB (D.D.C. Sept. 11, 2018).

326.  Sanofi confirmed in a February 2016 letter to HRSA that the company had ceased charging true Ceiling Prices on July 1, 2015 with regard to drugs whose URA equaled the AMP:

> On June 10, 2015, we wrote to inform the Office of Pharmacy Affairs ("OPA") that Sanofi had reexamined the practice of setting its ceiling price at $0.01 per unit when the ceiling price calculates or rounds to zero, in accordance with Release 2011-2, and had concluded that penny pricing is not required, and that alternative approaches are permissible. The June letter is attached hereto as Attachment 1. Indeed, since our letter, HRSA issued a proposed rule, on which Sanofi commented, and in which HRSA itself acknowledged that the penny pricing policy is not enforceable. 80 Fed. Reg. 34,583, 34,586 (June 17, 2015) ("This proposed regulation would allow HRSA to enforce the [penny pricing] policy in a manner that would require the manufacturer to charge a $0.01 . . .").
>
> Accordingly, effective July 1, 2015, Sanofi adopted the alternative approach of setting a product's 340B ceiling price at the product's Federal Ceiling Price ("FCP") when the calculated 340B ceiling price equals or rounds to zero.

Ex. B (ECF 2-3) at 1, *Am. Hosp. Ass'n*, No. 1:18-cv-02112-JDB (D.D.C. Sept. 11, 2018).

327.  As explained above, these comments and policies contradicted the unambiguous language of the 340B statute and reflected an objectively unreasonable interpretation of the statute.  *See supra* ¶¶ 97-109.

a.    Apidra

328.  Sanofi's drug Apidra, a rapid-acting insulin analogue, is available in two versions (100 units/ml vial and solostar 100 units/ml).  Apidra has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing.  From 2014 to 2018, Medicaid programs paid $357,807,253 for Apidra.

329.  The annual growth rate in the cost per dosage unit of Apidra between 2014 and 2018 was 9.65%, far higher than the average CPI-U rate of inflation during this time period, 1.62%.  The price of Apidra increased from $302 in 2014 to $521 in 2019.

330.  From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing,

unlawfully inflated prices for Apidra 100 units/ml vial ranging from $54.25 (Q1 2016) to $104.32 (Q4 2018) per package, or as high as 103,320% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($0.10 per package), a price that has stayed consistent through the second quarter of 2021.  Sanofi has not refunded the Apidra 100 units/ml vial overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

331.  From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Apidra solostar 100 units/ml ranging from $104.35 (Q1 2016) to $201.53 (Q4 2018) per package, or as high as 134,353% of the statutorily mandated penny Ceiling Price.  Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($0.15 per package), a price that has stayed consistent through the second quarter of 2021. Sanofi has not refunded the Apidra solostar 100 units/ml overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

### b.  Lantus

332.  Sanofi's drug Lantus, a long-acting insulin used to treat diabetes, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing.  From 2014 to 2018, Medicaid programs paid $5,996,158,862 for Lantus.

333.  Lantus is available in two versions (100 units/ml vial and solostar 100 units/ml).

334.  The annual growth rate in the cost per dosage unit of Lantus between 2012 and 2016 was 18.7%, far higher than the average CPI-U rate of inflation during this time period, 1.47%—a trend that continued for more than a decade.  From 2010

to 2015, Sanofi raised the price of Lantus by 168 percent; from 2005 to 2015, Sanofi increased Lantus's WAC by almost 250 percent.

335. Sanofi carefully tracked the price increases of Lantus over time in relation to CPI. An internal Sanofi document demonstrates that Sanofi knowingly and intentionally increased the price of Lantus above the rate of inflation every year from 2006 through 2014, increasing more than fourfold:

**Lantus Price Evolution**

| | NS | VOL | Price | WAC | GTN | CPI | CPI Growth | Act Growth | Δ | WAC | Net | Growth vs 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | | | | | | 3% | | | | 57.35 | 46.92 | | |
| 2006 | 40% | 19% | 20% | 15% | 5% | 3% | 29 | 184 | 155 | 64.67 | 54.97 | | |
| 2007 | 30% | 17% | 13% | 13% | 0% | 3% | 35 | 167 | 132 | 71.96 | 61.22 | WAC | NET |
| 2008 | 31% | 16% | 14% | 18% | -3% | 4% | 62 | 236 | 174 | 83.04 | 68.81 | 15.4% | 12.4% |
| 2009 | 24% | 14% | 10% | 12% | -3% | 0% | (9) | 207 | 215 | 91.95 | 74.66 | 27.8% | 22.0% |
| 2010 | 7% | 4% | 3% | 10% | -7% | 2% | 42 | 76 | 34 | 100.64 | 76.72 | 39.9% | 25.3% |
| 2011 | 15% | 11% | 4% | 10% | -6% | 3% | 91 | 109 | 18 | 109.98 | 79.37 | 52.8% | 29.7% |
| 2012 | 22% | 6% | 16% | 19% | -4% | 2% | 68 | 508 | 439 | 130.05 | 91.03 | 80.7% | 48.7% |
| 2013 | 26% | 7% | 19% | 25% | -6% | 2% | 59 | 754 | 694 | 160.16 | 107.27 | 122.6% | 75.2% |
| 2014 | 12% | 1% | 11% | 35% | -24% | 2% | 80 | 563 | 484 | 215.74 | 119.28 | 199.8% | 94.8% |
| 2015 | -20% | 1% | -21% | 15% | -37% | 0% | 6 | (1,202) | (1,208) | 248.41 | 93.97 | 245.2% | 53.5% |
| 2016 | -13% | -6% | -6% | 0% | -7% | 1% | 45 | (290) | (334) | 248.45 | 87.48 | 245.2% | 42.9% |
| | | | | | | | $ 304 | $ 731 | $ 428 | | | | |

Staff of S. Fin. Comm., 116th Cong., *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug* 46 (Jan. 14, 2021), *available at* www.finance.senate.gov/download/grassley-wyden-insulin-report.

336. These price increases were motivated purely by profit. Sanofi "'went into 2013 with eyes wide open that the significant price increases planned would inflame [its] customers,'" but "was seeking to make up for 'shortfalls with Lantus demand generation and global profit shortfalls'" that had "'put pressure on the US [division] to continue with the price increases to cover gaps.'" *Id.* at 52.

337. Even though Sanofi dramatically increased the price of Lantus for many years (and would thus be liable for the corresponding Medicaid and 340B statutory penny price), it refused to offer true Ceiling Prices under the 340B statute. From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated

prices for Lantus ranging from $71.19 (Q1 2016) to $88.92 (Q4 2018) per package of Lantus 100 units/ml, or as high as 88,920% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($0.10 per package), a price that has stayed consistent through the second quarter of 2021.

338. From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Lantus ranging from $128.00 (Q1 2016) to $133.38 (Q4 2018) per package of Lantus Solostar 100 units/ml, or as high as 88,920% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($0.15 per package), a price that has stayed consistent through the second quarter of 2021. Sanofi has not refunded overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing for either form of Lantus.

### c.    Renagel

339. Sanofi's drug Renagel (acquired when Sanofi bought Genzyme), used to treat hyperphosphatemia in patients with chronic kidney disease, has been heavily used by 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2012 to 2016, Medicaid programs paid $326,235,033 for Renagel.

340. There are two strengths of Renagel available: 400 mg and 800 mg.

341. The price of Renagel has risen steeply since it was first launched. The retail price of a 1-year supply of Renagel 800 mg tablets increased by $11,055 in the 10-year period ending in 2015. The retail price for a 1-year supply of this drug rose from $3,113 in 2006 to $14,168 in 2015—more than a four-fold increase. Stephen W. Schondelmeyer & Leigh Purvis, *AARP Public Policy Institute Trends in Retail Prices of Brand Name Prescription Drugs Widely Used by Older Americans, 2006*

*to 2015,* at 10 (2016), https://www.aarp.org/content/dam/aarp/ppi/2016-12/trends-in-retail-prices-dec-2016.pdf.

342. The annual growth rate in the cost per dosage unit of Renagel between 2012 and 2016 was an astounding 22.1%, far higher than the average CPI-U rate of inflation during this time period, 1.47%.

343. From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Renagel 400 mg ranging from $539.07 (Q1 2016) to $750.85 (Q4 2018) per package, or as high as 41,714% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($1.80 per package) a price that has remained consistent through Q3 2019, after which there was no pricing. Sanofi has not refunded the Renagel 400 mg overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

344. From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Renagel 800 mg ranging from $541.06 (Q1 2016) to $750.85 (Q4 2018) per package, or as high as 20,856% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($3.60 per package) a price that has remained consistent through the second quarter of 2021. Sanofi has not refunded the Renagel 800 mg overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

d. Renvela

345. Sanofi's drug Renvela (acquired when Sanofi bought Genzyme), used to treat patients with chronic kidney disease, has been heavily used by 340B Covered

Entities, as well as Medicare and Medicaid programs using 340B pricing. From 2014 to 2018, Medicaid programs paid $349,607,013 for Renvela.

346. Renvela is available in three versions: powder packets (0.8 gm and 2.4 gm) and tablets (800 mg).

347. The annual growth rate in the cost per dosage unit of Renvela between 2014 and 2018 was 10.03%, far higher than the average CPI-U rate of inflation during this time period, 1.62%.

348. Even though Sanofi dramatically increased its Renvela prices for many years (and would thus be liable for the corresponding Medicaid and 340B inflationary penalty), it refused to offer accurate Ceiling Prices under the 340B statute.

349. From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Renvela 0.8 gm ranging from $562.44 (Q1 2016) to $583.38 (Q4 2018) per package, or as much as 64,820% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($0.90 per package), a price that has stayed consistent (with the exception of Q2 and Q3) through the second quarter of 2021. Sanofi has not refunded the Renvela 0.8 gm overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

350. From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Renvela 2.4 gm ranging from $562.44 (Q1 2016) to $563.08 (Q4 2018) per package, or as much as 62,564% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($0.90 per package), a price that has stayed consistent through the second quarter of 2021. Sanofi has not refunded the

Renvela 2.4 gm overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

351. From Q1 2016 (if not much earlier) through Q4 2018, Sanofi charged Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, unlawfully inflated prices for Renvela 800 mg tablet ranging from $562.44 (Q1 2016) to $576.88 (Q4 2018) per package, or as much as 21,366% of the statutorily mandated penny Ceiling Price. Not until the first quarter of 2019 did Sanofi begin charging the statutorily mandated penny Ceiling Price ($2.70 per package), a price that has stayed consistent through the second quarter of 2021. Sanofi has not refunded the Renvela 800 mg tablet overcharges to Covered Entities or to Medicare and Medicaid programs using 340B pricing.

**D.      Defendants Concealed the Truth and Acted Knowingly and Intentionally**

353. Each Defendant concealed its fraudulent conduct from Covered Entities, HHS, Medicaid programs, and Medicare programs by controlling access to the pricing information by which the 340B Ceiling Prices were set.

354. Each Defendant prevented Covered Entities, HHS, Medicaid programs, and Medicare programs from knowing the actual prices charged for these drugs. Each Defendant closely guarded its pricing data and sales figures for its 340B covered drugs.

355. Each Defendant's efforts to conceal its pricing for numerous of its most expensive brand name drugs is evidence that it knew that this conduct was fraudulent. Moreover, Defendants' misconduct was attributable not to a reasonable interpretation of an ambiguous regulatory scheme, but to a knowing and intentional disregard of the clear 340B statutory penny pricing formula.

356. Thus, each Defendant concealed that (i) its 340B prices did not comply with the 340B statutory penny price formula, and (ii) it was in violation of the terms

of the PPA and PPA Addendum it had signed with HHS.

## VIII. <u>DEFENDANTS CONSPIRED TO VIOLATE THE FCA</u>

357. Defendants participated in the conduct of their affairs through a pattern of conduct in violation the FCA conspiracy provisions, 31 U.S.C. § 3729(a)(1)(C), and analogous State *Qui Tam* conspiracy provisions. Specifically, Defendants engaged in a conspiracy to conceal accurate 340B prices from Covered Entities, as well as Medicare and Medicaid programs using 340B pricing. This conduct shall be referred to herein as the "Conspiracy."

358. Each Defendant agreed to operate or manage the Conspiracy and to coordinate violations of the FCA and its state-law counterparts, and each co-conspirator knowingly and intentionally agreed to facilitate others who did and do operate or manage the Conspiracy.

359. Members of the Conspiracy have systematically violated their statutory duty to report and charge true Ceiling Prices for 340B drugs. Consequently, Defendants sold many hundreds of thousands of 340B drugs at fraudulently inflated non-Ceiling Prices, which allowed Defendants to derive and be unjustly enriched by obscene profits.

360. In addition to their statutory duties, Defendants violated their contractual duties under their PPAs with HHS to report and sell 340B drugs at true Ceiling Prices.

361. The Conspiracy is an ongoing organization that functions as a continuing unit. It was created and used by Defendants as a tool to effectuate a pattern of activity. At all times material hereto, Defendants were aware of the essential nature and scope of the Conspiracy and intended to participate in and/or conduct it.

**A.**   **Defendants Coordinated Their Illegal Conduct through Trade Organizations**

362.   Defendants exerted control over the Conspiracy, and participated in the operation or management of its affairs through their memberships in various industry groups, such as the Pharmaceutical Research and Manufacturers of America ("PhRMA"), Biotechnology Industry Organization ("BIO"), and the Coalition for Government Procurement ("CGP").

363.   For example, in their comment letters regarding the Final Rules, Defendants made clear they had coordinated their positions regarding the 340B inflationary penalty, both directly with each other and through the trade organizations PhRMA, BIO, and CGP.  Each of their letters not only adopts the PhRMA, BIO, and/or CGP comment letters, but Defendants coordinated through these trade organizations.

364.   For example, on April 14, 2015—three days before PhRMA and BIO sent their own comment letters to HRSA—Novartis wrote to "affirm" the concerns that the trade organizations had yet to raise in opposition to HHS's NPRM: "Novartis affirms the majority of comments regarding the Proposed Rule submitted by both the Pharmaceutical Research and Manufacturers of America ('PhRMA') and the Biotechnology Industry Organization ('BIO')."

365.   Sanofi likewise adopted comments by PhRMA and BIO in a letter dated the same day as the trade associations' comment letters: "Sanofi supports the comments on the Proposed Rule submitted by both the Pharmaceutical Research and Manufacturers of America ('PhRMA') and the Biotechnology Industry Organization ('BIO')."

366.   In its April 19, 2017 letter, Allergan adopted the PhRMA position on the Rule:  "Allergan echoes the concerns about the CMP Final Rule expressed by the Pharmaceutical Research and Manufacturers of America (PhRMA) in their letter

commenting on the March 20 notice . . . .”

367. In a 2018 letter, AstraZeneca again states: “We agree with . . . PhRMA’s substantive concerns with the policies included in the final rule . . . . As PhRMA describes in its comment letter, the penny pricing policy can lead to serious unintended consequences, such as encouraging stockpiling by covered entities, resulting in shortages and disruptions to the marketplace.”

368. And AbbVie even acknowledged it had “actively participated” in drafting the PhRMA and BIO responses to the Rules: “AbbVie is a member of both the Pharmaceutical Research and Manufacturers of America (‘PhRMA’) and the Biotechnology Industry Organization (‘BIO’) trade groups. AbbVie has actively participated in the drafting of the April 2017 Interim Final Rule comments prepared by these groups.”

369. Not only that, in furtherance of their illegal scheme to conceal their fraudulent Ceiling Prices, Defendants have regularly communicated with each other, coordinating their positions on the 340B statutory penny price formula. One former Sanofi employee described her frequent participation on PhRMA conference calls with other drug makers to coordinate their activities on 340B pricing issues. At the time of these PhRMA calls, she had held various senior positions with Sanofi: as Senior Manager, Medicaid Pricing for Sanofi from January 2015 to November 2016, as a Senior Manager, Government Contracts and Operations from January 2008 to December 2015, and as a Manager, Federal Contracts from October 2006 to December 2008.

370. She described how PhRMA coordinated efforts for Sanofi and other pharmaceutical manufacturers in their efforts to sway public policy decisions around 340B pricing. The particulars of the 340B Program pricing were among the issues the companies banded on together. “You become part of PhRMA, and then you are on the calls,” she said. “There are industry initiatives, that the industry as a whole

decides on. We never did anything on our own—J&J, et cetera, all the big players get together and try to influence a change in the way [340B] pricing is."

371. It was thus part of the scheme and artifice that Defendants' coordinated communications directed toward government officials would be and were designed to preserve and increase the market prices for their 340B drugs while concealing Defendants' role in reporting and charging false 340B prices.

**B.    Defendants Coordinated to Conceal Accurate 340B Ceiling Prices**

372. Defendants' conduct was not designed to legitimately petition for redress or to advance a sincerely held legal position. Rather, at all times, Defendants knew their positions contradicted the plain text of the 340B statute and were based on an objectively unreasonable interpretation of the statute. Defendants adopted their positions as a delay tactic to prevent HHS from adopting regulations imposing civil penalties for violations of the 340B pricing formula, and to add a veneer of ostensible credibility to their refusal to abide by the terms of the 340B Program.

373. Throughout the existence of the Conspiracy, Defendants purposefully coordinated efforts to conceal violations of the 340B statutory penny pricing formula—all the while espousing to the general public, to Congress, federal and state agencies, their commitment to abide by the law.

374. For example, even while it concealed its ongoing violations of the law, Defendant Novartis claimed it was a "committed . . . 340B Program . . . stakeholder and places great emphasis on compliance with all statutory and regulatory requirements pertaining to government price reporting, including those under the 340B Program."

375. In its letter to HRSA dated April 17, 2017, Sanofi used very similar language as had Novartis in its letter to declare its public intention to comply with the law: "[A]s a 340B stakeholder, Sanofi is committed to complying with all

statutory and regulatory requirements pertaining to the 340B program and government pricing more broadly . . . ."

376. The dealings described herein were made in furtherance of the Defendants' unified scheme to increase and maintain their profits from unlawful sales of the 340B drugs. This unified scheme was furthered by (1) habitual noncompliance with federal and state law; and (2) intensive lobbying of federal and state officials to evade further detection and enforcement.

377. Defendants unlawfully, knowingly, and intentionally combined, conspired, confederated, and agreed together with each other, and with others whose names are both known and unknown, to conduct and participate, directly and indirectly, in the overall objective of their unified scheme, and participated in the common course of conduct to conceal the accurate 340B Ceiling Prices, all in violation of the FCA conspiracy provisions, 31 U.S.C. § 3729(a)(1)(C), as well as State *Qui Tam* conspiracy provisions.

378. Each of the Defendants had to agree to implement similar tactics regarding their joint scheme to conceal the accurate 340B statutory penny prices for their drugs. If any of the Defendants had properly disclosed the pattern of fraudulent 340B Ceiling Prices, the Conspiracy would have been endangered.

379. The illegal activities of the Conspiracy required extensive use of the wires and mails by each of the Defendants including, *inter alia*: (1) Defendants' practice of asserting their public commitment to abiding by their legal obligations under the 340B statute through various representations and statements in national publications and other fora by mail and/or wires (including the electronic submission of information); (2) false information provided by mail and/or wires (including the electronic submission of information) to federal agencies such as HHS and its sub-agency HRSA; (3) the use of webinars hosted by the trade associations PhRMA, BIO, and other organizations designed for Defendants to exchange detailed

104

information regarding their positions on 340B Ceiling Prices; (4) use of wires to transmit false 340B Ceiling Price reports (as required by their PPAs); (5) use of wires to transmit false information to HRSA; and (6) mailing and/or electronically transmitting 340B Ceiling Prices that Defendants knew would promote the Conspiracy.

380. Defendants' schemes amounted to common courses of conduct intended to cause 340B Covered Entities, as well as Medicare and Medicaid programs using 340B pricing, to pay hundreds of millions of dollars in fraudulently inflated 340B prices, in violation of 31 U.S.C. § 3729(a)(1)(C) and State *Qui Tam* conspiracy provisions. Within the Conspiracy, each such activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Covered Entities as well as Medicare and Medicaid programs using 340B pricing. Defendants' illegal activities, aimed at the affirmative concealment of true 340B pricing, have been part of their ongoing coordinated business activities designed to exact higher 340B prices from the government.

## IX. **CAUSES OF ACTION**

### COUNT I

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A))

381. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

382. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to the United States of America false or fraudulent claims for reimbursement of the cost of their drugs, in violation of 31 U.S.C. § 3729(a)(1)(A).

383. Because of each Defendant's actions, the United States of America has been, and continues to be, severely damaged.

## COUNT II

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

384. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

385. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using or causing to be made or used, false records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(2) and 31 U.S.C. § 3729(a)(1)(B).

386. The United States of America, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid and continues to pay or reimburse for their drugs provided to recipients of health care programs funded by the United States.

387. Because of each Defendant's actions, the United States of America has been, and continues to be, severely damaged.

## COUNT III

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C))

388. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

389. Defendants knowingly and intentionally conspired, and may still be conspiring, with each other and others alleged herein (as well as other unnamed co-conspirators) to commit acts in violation of 31 U.S.C. § 3729(a)(1) & (a)(2), and 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B). Defendants and their co-conspirators committed overt acts in furtherance of the conspiracy as alleged above.

390. Because of Defendant's actions, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV

### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G))

391. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

392. Each Defendant knowingly and intentionally avoided or decreased its obligation to pay or transmit money to the Government. Specifically, each Defendant: (i) made, used, or caused to made or used, a record or statement to conceal, avoid, or decrease an obligation to the United States; (ii) the records or statements were in fact false; and (iii) each Defendant knew that the records or statements were false.

393. Because of each Defendant's actions, the United States of America has been, and continues to be, severely damaged.

## COUNT V

### (Violation of California False Claims Act)

394. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

395. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented false or fraudulent claims for payment or approval in violation of Cal. Gov't Code § 12651(a)(1).

396. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or

107

statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

397. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of California or its political subdivisions, in violation of Cal. Gov't Code § 12651(a)(7).

398. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Cal. Gov't Code § 12651(a)(3).

399. The State of California or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continues to pay, for their drugs provided to recipients of health care programs funded by the State of California.

400. Because of each Defendant's actions, the State of California and its political subdivisions have been, and continue to be, severely damaged.

### COUNT VI

### (Violation of Colorado Medicaid False Claims Act)

401. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

402. Each Defendant, in reckless disregard or deliberate ignorance of the

truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented, or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the State of Colorado or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Colo. Rev. Stat. § 25.5-4-305(a).

403. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Colo. Rev. Stat. § 25.5-4-305(b).

404. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Colorado or its political subdivisions, in violation of Colo. Rev. Stat. § 25.5-4-305(f).

405. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Colo. Rev. Stat. § 25.5-4-305(g).

406. The State of Colorado or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their

drugs provided to recipients of health care programs funded by the State of Colorado.

407. Because of each Defendant's actions, the State of Colorado and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT VII

**(Violation of Connecticut False Claims Act for Medical Assistance Programs)**

408. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

409. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented to, and is still presenting or causing to be presented to, an officer or employee of the State of Connecticut or its political subdivisions false or fraudulent claims for payment, in violation of Conn. Gen. Stat. § 4-275(a)(1).

410. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid, in violation of Conn. Gen. Stat. § 4-275(a)(2).

411. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut or its political subdivisions, in violation of Conn. Gen. Stat. § 4-275(a)(7).

412. Defendants knowingly and intentionally have conspired to present, or

110

cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Conn. Gen. Stat. § 4-275(a)(3).

413. The State of Connecticut or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of health care programs funded by the State Connecticut.

414. Because of each Defendant's actions, the State of Connecticut and/or its political subdivisions have been, and continue to be, severely damaged.

**COUNT VIII**

**(Violation of Delaware False Claims and Reporting Act)**

415. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

416. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the State of Delaware or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code tit. 6, §1201(a)(1).

417. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of

111

Delaware or its political subdivisions, in violation of Del. Code tit. 6, §1201(a)(2).

418. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, increase or decrease an obligation to pay or transmit money to the State of Delaware or its political subdivisions, in violation of Del. Code tit. 6, § 120l(a)(7).

419. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Del. Code tit. 6, § 120l(a)(3).

420. The State of the State of Delaware or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of health care programs funded by the State of Delaware.

421. Because of each Defendant's actions, the State of Delaware and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT IX

### (Violation of District of Columbia False Claims Act)

422. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

423. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity

112

of the information, knowingly and intentionally presented, or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the District of Columbia, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-381.02(a)(l).

424. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be used, and is still making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District of Columbia, in violation of D.C. Code § 2-381.02(a)(2).

425. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District of Columbia, in violation of D.C. Code § 2-381.02(a)(6).

426. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of D.C. Code § 2-381.02(a)(7).

427. The District of Columbia, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and continues to pay, for their drugs provided to recipients of health insurance programs funded by the District.

428. Because of each Defendant's actions, the District of Columbia has

been, and continues to be, severely damaged.

## COUNT X

### (Violation of Florida False Claims Act)

429.   Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

430.   Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the State of Florida or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

431.   Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

432.   Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

433.   Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively

to advance and execute the objectives of the Conspiracy, in violation of Fla. Stat. § 68.082(2)(c).

434. The State of Florida or its agencies, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of health insurance plans funded by the State of Florida or its agencies.

435. Because of each Defendant's actions, the State of Florida and/or its agencies have been, and continue to be, severely damaged.

## COUNT XI

### **(Violation of Georgia False Medicaid Claims Act)**

436. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

437. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code § 49-4-168.1(a)(1).

438. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code § 49-4-168.1(a)(2).

439. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made

115

or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia or its political subdivisions, in violation of Ga. Code § 49-4-168.1(a)(7).

440. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Ga. Code § 49-4-168.1(a)(3).

441. The State of Georgia or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of Medicaid.

442. Because of each Defendant's actions, the State of Georgia and/or political subdivisions have been, and continue to be, severely damaged.

## COUNT XII

### (Violation of Hawaii False Claims Act)

443. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

444. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the State of Hawaii or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

445. Each Defendant, in reckless disregard or deliberate ignorance of the

116

truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made and used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

446. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

447. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Haw. Rev. Stat. § 661-21(a)(8).

448. The State of Hawaii or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of state funded health insurance programs.

449. Because of each Defendant's actions, the State of Hawaii and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XIII

### (Violation of Illinois False Claims Act)

450. Relator incorporates by reference the preceding paragraphs of this

Complaint as though fully set forth herein.

451.  Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(A).

452.  Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois or its political subdivisions, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(B).

453.  Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois or its political subdivisions, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(G).

454.  Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of 740 Ill. Comp. Stat. § 175/3(a)(1)(C).

455.  The State of Illinois or its political subdivisions, unaware of the falsity

118

of the claims and/or statements made by each Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of state funded health insurance programs.

456. Because of each Defendant's actions, the State of Illinois and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XIV

### (Violation of Indiana False Claims and Whistleblower Protection Act)

457. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

458. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and is still presenting or causing to be presented, false claims to the State of Indiana or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

459. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

460. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

461. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Ind. Code § 5-11-5.5-2(b)(y).

462. The State of Indiana or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of those claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of state funded health insurance programs.

463. Because of each Defendant's actions, the State of Indiana and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XV

### (Violation of Iowa False Claims Act)

464. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

465. Each Defendant, in reckless disregard or deliberate ignorance for the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented, or caused to be presented, and is still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Iowa Code § 685.2(1)(a).

466. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Iowa Code § 685.2(1)(b).

120

467. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Iowa or its political subdivisions, in violation of Iowa Code § 685.2(1)(g).

468. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Iowa Code § 685.2(1)(c).

469. The State of Iowa or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid for their drugs provided to recipients of health insurance programs funded by the state or its political subdivisions.

470. Because of each Defendant's actions, the State of Iowa and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XVI

### (Violation of Louisiana Medical Assistance Programs Integrity Law)

471. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

472. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented, or caused to be presented,

121

and is still presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. § 46:438.3(A).

473. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and is still engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. § 46:438.3(C).

474. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the medical assistance programs, or to knowingly conceal, avoid, or decrease an obligation to pay or transmit money or property to the medical assistance programs, in violation of La. Rev. Stat. § 46:438.3(C).

475. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of La. Rev. Stat. § 46:438.3(D).

476. The State of Louisiana, its medical assistance programs, political subdivisions, and/or the Department, unaware of the falsity of the claims and/or statements made by each Defendant, or their actions as set forth above, acted in reliance, and continue to act in reliance, on the accuracy of each Defendant's claims and/or statements in paying for their drugs provided to medical assistance program recipients.

477. Because of each Defendant's actions, the State of Louisiana, its medical

assistance programs, political subdivisions, and/or the Department have been, and continue to be, severely damaged.

## COUNT XVII

### (Violation of Maryland False Health Claims Act)

478. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

479. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Md. Code, Health-Gen. § 2-602(a)(1).

480. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Md. Code, Health-Gen. § 2-602(a)(2).

481. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Maryland or its political subdivisions, in violation of Md. Code, Health-Gen. § 2-602(a)(7).

482. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false

or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Md. Code, Health-Gen. § 2-602(a)(3).

483. The State of Maryland or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid for their drugs provided to recipients of health insurance programs funded by the state or its political subdivisions.

484. Because of each Defendant's actions, the State of Maryland and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XVIII

### (Violation of Massachusetts False Claims Act)

485. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

486. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

487. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

488. Each Defendant, in reckless disregard or deliberate ignorance of the

truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

489.   Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Mass. Gen. Laws ch. 12 § 5B(3).

490.   The Commonwealth of Massachusetts or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of health insurance programs funded by the state or its political subdivisions.

491.   Because of each Defendant's actions, the Commonwealth of Massachusetts and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XIX

### (Violation of Michigan Medicaid False Claims Act)

492.   Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

493.   Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made or caused to be made, and is

125

still making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

494. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

495. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and is still concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf each Defendant has applied for or is receiving a benefit with intent to obtain a benefit to which each Defendant were not entitled or in an amount greater than that to which each Defendant were entitled, in violation of Mich. Comp. Laws § 400.603(3).

496. Each Defendant, in possession of facts under which they are aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly and intentionally made, presented, or caused to be made or presented, and is still making, presenting, or causing to be presented, to an employee or officer of the State of Michigan or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

497. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false

126

or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Mich. Comp. Laws § 400.606(1).

498.   The State of Michigan or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of Medicaid.

499.   Because of each Defendant's actions, the State of Michigan and/or its political subdivisions have been, and continue to be, severely damaged.

**COUNT XX**

**<u>(Violation of Minnesota False Claims Act)</u>**

500.   Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

501.   Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the State of Minnesota or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Minn. Stat. § 15C.02(a)(1).

502.   Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claim paid or approved by the State of Minnesota or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(2).

503.   Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity

127

of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota or its political subdivisions, in violation of Minn. Stat. § 15C.02(a)(7).

504. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Minn. Stat. § 15C.02(a)(3).

505. The State of Minnesota or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs.

506. Because of each Defendant's actions, the State of Minnesota and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXI

### (Violation of Montana False Claims Act)

507. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

508. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the State of Montana or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code § 17-8-403(1)(a).

128

509. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana or its political subdivisions, in violation of Mont. Code § 17-8-403(1)(b).

510. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana or its political subdivisions, in violation of Mont. Code § 17-8-403(1)(g).

511. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Mont. Code § 17-8-403(1)(c).

512. The State of Montana or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of health insurance programs funded by the state or its political subdivisions.

513. Because of each Defendant's actions, the State of Montana and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXII

### (Violation of Nevada False Claims Act)

514. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

515. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

516. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

517. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

518. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Nev. Rev.

130

Stat. § 357.040(1)(i).

519. The State of Nevada or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of health insurance programs funded by the state or its political subdivisions.

520. Because of each Defendant's actions, the State of Nevada and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXIII

### (Violation of New Jersey False Claims Act)

521. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

522. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an employee, officer, or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. § 2A:32C-3(a).

523. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to made or used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey or its political subdivisions, in violation of N.J. Stat. § 2A:32C-3(b).

524. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity

of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey or its political subdivisions, in violation of N.J. Stat. § 2A:32C-3(g).

525. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of N.J. Stat. § 2A:32C-3(c).

526. The State of New Jersey or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of Medicaid.

527. Because of each Defendant's actions, the State of New Jersey and/or its political subdivisions have been, and continue to be, severely damaged.

**COUNT XXIV**

**<u>(Violation of New Mexico Fraud Against Taxpayers Act)</u>**

528. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

529. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to the State of New Mexico or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of N.M. Stat. § 44-9-3(A)(1).

132

530. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the State of New Mexico or its political subdivisions, in violation of N.M. Stat. § 44-9-3(A)(2).

531. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. § 44-9-3(A)(8).

532. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of N.M. Stat. § 44-9-3(A)(3), (4).

533. The State of New Mexico or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for prescription drugs for recipients of health insurance programs funded by the state or its political subdivisions.

534. Because of each Defendant's actions, the State of New Mexico and/or its political subdivisions have been, and continue to be, severely damaged.

133

## COUNT XXV

### (Violation of New York False Claims Act)

535.  Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

536.  Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

537.  Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

538.  Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

539.  Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of N.Y. State Fin. Law § 189(1)(c), (h).

540. The State of New York or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of health insurance programs funded by the state or its political subdivisions.

541. Because of each Defendant's actions, the State of New York and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXVI

### (Violation of North Carolina False Claims Act)

542. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

543. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

544. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

545. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to

135

the State of North Carolina or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

546. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of N.C. Gen. Stat. § 1-607(a)(3).

547. The State of North Carolina or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of health insurance programs funded by the state or its political subdivisions.

548. Because of each Defendant's actions, the State of North Carolina and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXVII

### (Violation of Oklahoma Medicaid False Claims Act)

549. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

550. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the State of Oklahoma or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

551. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity

136

of the information, knowingly and intentionally made or caused to be made, and is still making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

552. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

553. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Okla. Stat. tit. 63, § 5053.1(B)(3).

554. The State of Oklahoma or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of Medicaid.

555. Because of each Defendant's actions, the State of Oklahoma and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXVIII
### (Violation of Rhode Island False Claims Act)

556. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

137

557. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

558. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made or caused to be made, and is still making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

559. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

560. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of R.I. Gen. Laws § 9-1.1-3(a)(3).

561. The State of Rhode Island or its political subdivisions, unaware of the

falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of Medicaid.

562. Because of each Defendant's actions, the State of Rhode Island and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXIX

### (Violation of Tennessee Medicaid False Claims Act)

563. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

564. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to the State of Tennessee or its political subdivisions, false or fraudulent claims for payment under the Medicaid program, in violation of Tenn. Code § 71-5-182(a)(1)(A).

565. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee or its political subdivisions, in violation of Tenn. Code § 71-5-182(a)(1)(B).

566. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit

money to the State of Tennessee or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code § 71-5-182(a)(1)(D).

567. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Tenn. Code § 71-5-182(a)(1)(C).

568. The State of Tennessee or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of the Medicaid program.

569. Because of each Defendant's actions, the State of Tennessee and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXX

### (Violation of Texas Medical Assistance Program, Damages, and Penalties Act)

570. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

571. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made or caused to be made, and is still making or causing to be made, false statements or misrepresentations of material fact that permitted each Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code § 36.002(1).

572. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity

140

of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and is still concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted each Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code § 36.002(2).

573. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, caused to be made, induced, or sought to induce, and is still making, causing to be made, inducing, or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a Federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code § 36.002(4)(B).

574. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, and is still making, claims under the Medicaid program for products that were inappropriate, in violation of Tex. Hum. Res. Code § 36.002(7)(C).

575. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Tex. Hum. Res. Code § 36.002(9).

576. The State of Texas or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the

141

accuracy of these claims and/or statements, paid, and continue to pay, for prescription drugs for recipients of Medicaid.

577. Because of each Defendant's actions, the State of Texas and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXXI

### (Violation of Vermont False Claims Act)

578. Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

579. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made or caused to be made, and is still making or causing to be made, false statements or misrepresentations of material fact that permitted each Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Vt. Stat. tit. 32, § 631(a)(1)-(2).

580. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed—and is still concealing or failing to disclose, or causing to be concealed or not disclosed—information that permitted each Defendant to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Vt. Stat. tit. 32, § 631(a).

581. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, caused to be made, induced, or sought to induce, and is still making, causing to be made, inducing, or seeking to

induce, false statements or misrepresentations of material fact concerning information required to be provided by a Federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Vt. Stat. tit. 32, § 631(a)(2).

582. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, and is still making, claims under the Medicaid program for products that were inappropriate, in violation of Vt. Stat. tit. 32, § 631(a).

583. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Vt. Stat. tit. 32, § 631(a)(12).

584. The State of Vermont or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance on the accuracy of these claims and/or statements, paid, and continue to pay, for prescription drugs for recipients of Medicaid.

585. Because of each Defendant's actions, the State of Vermont and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXXII

### (Violation of Virginia Fraud Against Taxpayers Act)

586. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

587. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity

143

of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code § 8.01-216.3(A)(1).

588. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia or its political subdivisions, in violation of Va. Code § 8.01-216.3(A)(2).

589. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia or its political subdivisions, in violation of Va. Code § 8.01-216.3(A)(7).

590. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Va. Code § 8.01-216.3(A)(3).

591. The Commonwealth of Virginia or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of state funded health insurance programs.

592. Because of each Defendant's actions, the Commonwealth of Virginia and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXXIII

### (Violation of Washington Medicaid False Claims Act)

593. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

594. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of Wash. Rev. Code § 74.66.020(1)(a).

595. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Wash. Rev. Code § 74.66.020(1)(b).

596. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Washington or its political subdivisions, in violation of Wash. Rev. Code § 74.66.020(1)(g).

597. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false

145

or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of Wash. Rev. Code § 74.66.020(1)(c).

598. The State of Washington or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of state funded health insurance programs.

599. Because of each Defendant's actions, the State of Washington and/or its political subdivisions have been, and continue to be, severely damaged.

## COUNT XXXIV

**(Violation of False Claims to Government of Puerto Rico Programs, Contracts, and Services Act)**

600. Relator incorporates by reference the preceding paragraphs of this Complaint as though fully set forth herein.

601. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally presented or caused to be presented, and is still presenting or causing to be presented, false or fraudulent claims for payment of approval, in violation of P.R. Laws tit. 32, § 2934(1)(a).

602. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of P.R. Laws tit. 32, § 2934(1)(b).

603. Each Defendant, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity

146

of the information, knowingly and intentionally made, used, or caused to be made or used, and is still making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Puerto Rico or its political subdivisions, in violation of P.R. Laws tit. 32, § 2934(1)(d).

604. Defendants knowingly and intentionally have conspired to present, or cause to be presented, false or fraudulent claims for payment or approval and to make, use, or cause to be made or used, false records or statements material to false or fraudulent claims, and have taken multiple overt acts individually and collectively to advance and execute the objectives of the Conspiracy, in violation of P.R. Laws tit. 32, § 2934(1)(c).

605. The Commonwealth of Puerto Rico or its political subdivisions, unaware of the falsity of the claims and/or statements made by each Defendant, and in reliance upon the accuracy of these claims and/or statements, paid, and continue to pay, for their drugs provided to recipients of state funded health insurance programs.

606. Because of each Defendant's actions, the Commonwealth of Puerto Rico and/or its political subdivisions have been, and continue to be, severely damaged.

## X.    **PRAYER FOR RELIEF**

**WHEREFORE,** Relator prays for judgment against each Defendant as follows:

a.    That each Defendant be ordered to cease and desist from submitting any more false claims, or further violating 31 U.S.C. §§ 3729 *et seq.*; Cal. Gov't Code §§ 12650 *et seq.*; Colo. Rev. Stat. §§ 25.5-4-304 *et seq.*; Conn. Gen. Stat. §§ 4-274 *et seq.*; Del. Code Ann. tit. 6, §§ 1201 *et seq.*; D.C. Code §§ 2-381.01 *et seq.*; Fla. Stat. §§ 68.081 *et seq.*; Ga. Code Ann. §§ 49-4-168 *et seq.*; Haw. Rev. Stat. §§

147

661-21 *et seq.*; 740 Ill. Comp. Stat. §§ 175/1 *et seq.*; Ind. Code §§ 5-11-5.7 *et seq.*; Iowa Code tit. 15 §§ 685.1 *et seq.*; La. Rev. Stat. Ann. §§ 46:437.1 *et seq.*; Md. Code Ann., Health Gen. §§ 2-601 *et seq.*; Mass. Gen. Laws ch. 12, §§ 5A *et seq.*; Mich. Comp. Laws §§ 400.601 *et seq.*; Minn. Stat. §§ 15C.01 *et seq.*; Mont. Code Ann. §§ 17-8-401 *et seq.*; Nev. Rev. Stat. §§ 357.010 *et seq.*; N.J. Stat. Ann. §§ 2A:32C-1 *et seq.*; N.M. Stat. Ann. §§ 44-9-3(C)(1) *et seq.*; N.Y. State Fin. Law Art. XIII §§ 187 *et seq.*; N.C. Gen. Stat. §§ 1-605 *et seq.*; Okla. Stat. tit. 63, §§ 5053 *et seq.*; R.I. Gen. Laws §§ 9-1.1-1 *et seq.*; Tenn. Code Ann. §§ 71-5-181 *et seq.*; Tex. Hum. Res. Code Ann. §§ 36.001 *et seq.*; Tex. Hum. Res. Code. Ann. §§ 32.039 *et seq.*; Va. Code Ann. §§ 8.01-216.1 *et seq.*; Vt. Stat. Ann. tit. 32, §§ 630 *et seq.*; Wash Rev. Code §§ 74.66.005 *et seq.*; and P.R. Laws tit. 32, §§ 2934 *et seq.*;

b.      That judgment be entered against each Defendant in the amount of each false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by 31 U.S.C. § 3729(a) and 15 C.F.R. § 63(a)(3), as adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

c.      That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of California or its political subdivisions multiplied as provided for in Cal. Gov't Code § 12651(a), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Cal. Gov't Code § 12651(a), as adjusted for inflation, to the extent such penalties shall fairly compensate the State of California or its political

148

subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

d.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Colorado or its political subdivisions multiplied as provided for in Colo. Rev. Stat. § 25.5-4-305(1), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Colo. Rev. Stat. § 25.5-4-305(1), to the extent such multiplied penalties shall fairly compensate the State of Colorado or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

e.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 4-275(b)(2), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Conn. Gen. Stat. § 4-275(b)(1), as adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

f.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Delaware multiplied as provided for in Del. Code Ann. tit. 6, §1201(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Del. Code Ann. tit. 6, §1201(a), to the

extent such multiplied penalties shall fairly compensate the State of Delaware for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

g.      That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the District of Columbia, multiplied as provided for in D.C. Code § 2-381.02(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, and the costs of this civil action brought to recover such penalty and damages, as provided by D.C. Code § 2-381.02(a), to the extent such multiplied penalties shall fairly compensate the District of Columbia for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

h.      That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Florida or its agencies multiplied as provided for in Fla. Stat. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Fla. Stat. Ann. § 68.082(2), to the extent such multiplied penalties shall fairly compensate the State of Florida or its agencies for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

i.      That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Georgia or its political subdivisions multiplied as provided for in Ga. Code Ann. § 49-4-168.1(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Ga. Code Ann. § 49-4-168.1(a), to the extent such multiplied penalties shall fairly compensate

150

the State of Georgia or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

j. That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Hawaii, multiplied as provided for in Haw. Rev. Stat. § 661-21(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Haw. Rev. Stat. § 661-21(a), to the extent such multiplied penalties shall fairly compensate the State of Hawaii for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

k. That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Illinois, multiplied as provided for in 740 Ill. Comp. Stat. § 175/3(a)(1)(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(A), and the costs of this civil action as provided by 740 Ill. Comp. Stat. § 175/3(a)(1)(B), to the extent such penalties shall fairly compensate the State of Illinois for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

l. That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Indiana, multiplied as provided for in Ind. Code § 5-11-5.5-2(b), plus a civil penalty of at least five thousand dollars ($5,000) per false claim, as provided by Ind. Code § 5-11-5.5-2(b), to the extent such penalties shall fairly compensate the State of Indiana for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

151

m.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Iowa, multiplied as provided for in Iowa Code § 685.2(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as adjusted for inflation, as provided by Iowa Code § 685.2(1), to the extent such multiplied penalties shall fairly compensate the State of Iowa or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

n.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by Louisiana's medical assistance programs, multiplied as provided for in La. Rev. Stat. Ann. § 46:438.6(B)(2), plus a civil penalty of no less than five thousand five hundred dollars ($5,500) and no more than eleven thousand dollars ($11,000) per false claim, plus payment of interest as provided for in La. Rev. Stat. Ann. § 46:438.6(C)(1)(b), to the extent such multiplied fines and penalties shall fairly compensate the State of Louisiana's medical assistance programs for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

o.    That judgment be entered in Relator's favor and against each Defendant for restitution to the State of Maryland or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of each Defendant's unlawful acts, as provided for in Md. Code Ann., Health-Gen. § 2-602(a), multiplied as provided for in Md. Code Ann., Health-Gen. § 2-602(b)(1)(ii), plus a civil penalty of not more than ten thousand dollars ($10,000) per false claim, pursuant to Md. Code Ann., Health-Gen. § 2-602(b)(1)(i), to the extent such penalties fairly compensate the State of Maryland or its political subdivisions for losses resulting

152

from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

p.      That judgment be entered in Relator's favor and against each Defendant for restitution to the Commonwealth of Massachusetts or its political subdivisions in the amount of a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, plus three times the amount of damages, including consequential damages, sustained by Massachusetts as the result of each Defendant's actions, plus the expenses of the civil action brought to recover such penalties and damages, as provided by Mass. Gen. Laws ch. 12. § 5B, as adjusted for inflation, to the extent such penalties shall fairly compensate the Commonwealth of Massachusetts or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

q.      That judgment be entered in Relator's favor and against each Defendant for restitution to the State of Michigan or its political subdivisions for the value of payments or benefits provided as a result of each Defendant's unlawful acts, plus a civil penalty of triple the amount of damages suffered by Michigan as a result of each Defendant's unlawful conduct, as well as not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Mich. Comp. Laws § 400.612(1), as well as the costs incurred by both Michigan and Relator, as provided by §§ 400.610a(9) and 400.610b, in order to fairly compensate the State of Michigan or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

r.      That judgment be entered in Relator's favor and against each Defendant for restitution to the State of Minnesota or its political subdivisions for the value of

payments or benefits provided as a result of each Defendant's unlawful acts, plus a civil penalty of triple the amount of damages suffered by Minnesota as a result of each Defendant's unlawful conduct, as well as not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Minn. Stat. § 15C.02(a), as well as the costs incurred by both Michigan and Relator, as provided by Minn. Stat. § 15C.12, in order to fairly compensate Minnesota or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

s.      That judgment be entered in Relator's favor and against each Defendant for restitution to the State of Montana or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of each Defendant's unlawful acts, as provided for in Mont. Code Ann. § 17-8-403, multiplied as provided for in Mont. Code Ann. § 17-8-403(2), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, pursuant to Mont. Code Ann. § 17-8-403(2), to the extent such multiplied penalties shall fairly compensate the State of Montana or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

t.      That judgment be entered in Relator's favor and against each Defendant for restitution to the State of Nevada for the value of payments or benefits provided, directly or indirectly, as a result of each Defendant's unlawful acts, as provided for in Nev. Rev. Stat. § 357.040, multiplied as provided for in Nev. Rev. Stat. § 357.040(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, pursuant to Nev. Rev. Stat. § 357.040(2)(c), as adjusted for inflation, to the extent such multiplied penalties shall fairly

154

compensate the State of Nevada for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

u.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of New Jersey or its political subdivisions multiplied as provided for in N.J. Stat. Ann. § 2A:32C-3, plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, to the extent such multiplied penalties shall fairly compensate the State of New Jersey or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

v.    That judgment be entered in Relator's favor and against each Defendant for restitution to the State of New Mexico or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of each Defendant's unlawful acts, as provided for in N.M. Stat. Ann. § 44-9-3(C), multiplied as provided for in N.M. Stat. Ann. § 44-9-3(C)(1), plus a civil penalty of not less than five thousand dollars ($5,000) and not more than ten thousand dollars ($10,000) per false claim, as provided by N.M. Stat. Ann. § 44-9-3(C)(2), to the extent such multiplied penalties shall fairly compensate the State of New Mexico or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery, as well as the costs of this action and reasonable attorney fees as provided by N.M. Stat. Ann. § 44-9-3(C)(3)-(4);

w.    That judgment be entered in Relator's favor and against each Defendant for restitution to the State of New York or its political subdivisions for the value of payments or benefits provided, directly or indirectly, as a result of each Defendant's

unlawful acts, as provided for in N.Y. State Fin. Law § 189(1), multiplied as provided for in N.Y. State Fin. Law § 189(1), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) per false claim, pursuant to N.Y. State Fin. Law § 189(1), to the extent such multiplied penalties shall fairly compensate the State of New York or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

x.    That judgment be entered in Relator's favor and against each Defendant for restitution to the State of North Carolina for the value of payments or benefits provided, directly or indirectly, as a result of each Defendant's unlawful acts, as provided for in N.C. Gen. Stat. § 1-607, multiplied as provided for in N.C. Gen. Stat. § 1-607(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by N.C. Gen. Stat. § 1-607(a), to the extent such multiplied penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

y.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Oklahoma or its political subdivisions multiplied as provided for in Okla. Stat. tit. 63, § 5053.1(B), plus a civil penalty of not less than five thousand dollars ($5,000) or more than ten thousand dollars ($10,000) per false claim, as provided by Okla. Stat. tit. 63, § 5053.1(B), to the extent such multiplied penalties shall fairly compensate the State of Oklahoma or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

z.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Rhode Island or its political subdivisions multiplied as provided for in R.I. Gen. Laws § 9-1.1-3(a), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by R.I. Gen. Laws § 9-1,1-3(a), to the extent such multiplied penalties shall fairly compensate the State of Rhode Island or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

aa.    That judgment be entered in Relator's favor and against each Defendant for restitution to the State of Tennessee for the value of payments or benefits provided, directly or indirectly, as a result of each Defendant's unlawful acts, as provided for in Tenn. Code Ann. § 71-5-182, multiplied as provided for in Tenn. Code Ann. § 71-5-182(a)(l), plus a civil penalty of not less than five thousand dollars ($5,000) or more than twenty-five thousand dollars ($25,000) per false claim, pursuant to Tenn. Code Ann. § 71-5-182(a)(l), as adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

bb.    That judgment be entered in Relator's favor and against each Defendant for restitution to the State of Texas for the value of payments or benefits provided, directly or indirectly, as a result of each Defendant's unlawful acts, as provided for in Tex. Hum. Res. Code Ann. § 36.052(a) and Tex. Hum. Res. Code Ann. § 32.039, multiplied as provided for in Tex. Hum. Res. Code Ann. § 36.052(a)(4), the interest on the value of such payments or benefits at the prejudgment interest rate in effect on the day the payment or benefit was paid or received, for the period from the date the payment or benefit was paid or received to the date that restitution is made to the

157

State of Texas, pursuant to Tex. Hum. Res. Code Ann. § 36.052(a)(2), plus an administrative penalty not to exceed twice the amount paid, as provided by Tex. Hum. Res. Code. Ann. § 32.039(c)(2), plus a civil penalty of not less than the minimum civil penalty and not more than the maximum civil penalty allowed under the federal False Claims Act (31 U.S.C. § 3729(a)(1)) per false claim, as provided by Tex. Hum. Res. Code Ann. § 36.052(a)(3)(A) & (B), plus an administrative penalty of not less than five thousand dollars ($5,000) or more than fifteen thousand dollars ($15,000) for each unlawful act, pursuant to Tex. Hum. Res. Code. Ann. § 32.039(c)(2)(A) & (B), to the extent such multiplied penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

cc. That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Vermont or its political subdivisions, multiplied as provided for in Vt. Stat. Ann. tit. 32, § 631(b)(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) and not more than eleven thousand dollars ($11,000) per false claim, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(1), as well as the costs incurred by the State of Vermont, as provided by Vt. Stat. Ann. tit. 32, § 631(b)(3), in order to fairly compensate the State of Vermont or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

dd. That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the Commonwealth of Virginia, multiplied as provided for in Va. Code Ann. § 8.01-216.3(A), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) per false claim, as provided by Va. Code Ann. § 8.01-

158

216.3(A), to the extent such multiplied penalties shall fairly compensate the Commonwealth of Virginia for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

ee.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the State of Washington or its political subdivisions multiplied as provided for in Wash. Rev. Code § 74.66.020 (1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by Wash. Rev. Code § 74.66.020(1) and Wash. Admin. Code § 44-02-010, as adjusted for inflation, to the extent such penalties shall fairly compensate the State of Washington or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

ff.    That judgment be entered in Relator's favor and against each Defendant in the amount of the damages sustained by the Commonwealth of Puerto Rico and its political subdivisions, multiplied as provided for in P.R. Laws tit. 32, § 2934(1), plus a civil penalty of not less than eleven thousand four hundred sixty-three dollars ($11,463) or more than twenty-two thousand nine hundred twenty-seven dollars ($22,927) per false claim, as provided by P.R. Laws tit. 32, § 2934(1), as adjusted for inflation, as well as the costs incurred by Relator and the Commonwealth of Puerto Rico, as provided by P.R. Laws tit. 32, § 2934(3), in order to fairly compensate the Commonwealth of Puerto Rico or its political subdivisions for losses resulting from the various schemes undertaken by each Defendant, together with penalties for specific claims to be identified at trial after full discovery;

gg.    That each Defendant be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

hh.     That judgment be granted for Relator against each Defendant for all costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Relator in the prosecution of this suit;

ii.     That the Court issue an order enjoining each Defendant from continuing to engage in the fraudulent conduct alleged herein; and

jj.     That this Court award such further relief as it deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.


Dated: May 20, 2021          By: _____

Roland Tellis (SBN 186269)
rtellis@baronbudd.com
Mark Pifko (SBN 228412)
mpifko@baronbudd.com
**BARON & BUDD, P.C.**
15910 Ventura Blvd., Suite 1600
Encino, CA 91436
Telephone: 818.839.2333
Facsimile: 214.520.1181

W. Scott Simmer (*pro hac vice* pending)
ssimmer@baronbudd.com
Noah M. Rich (*pro hac vice* pending)
nrich@baronbudd.com
**BARON & BUDD, P.C.**
600 New Hampshire Ave. NW, 10th Floor
Washington, DC 20037
Telephone: 202.333.7352
Facsimile: 202.337.1039

William H. von Oehsen (*pro hac vice* pending)
William.vonOehsen@PowersLaw.com
Ronald S. Connolly (*pro hac vice* pending)
Ron.Connelly@PowersLaw.com
Megan La Suer (*pro hac vice* pending)
Megan.Lasuer@powerslaw.com|
**POWERS PYLES SUTTER & VERVILLE PC**
1501 M Street NW, 7th Floor
Washington, DC 20005
Telephone: 202.872.6765
Facsimile: 202.785.1756

*Attorneys for Relator*